53 So.2d 199 (1951)
RICHARDSON
v.
DE LUCA et al.
No. 19470.
Court of Appeal of Louisiana, Orleans.
June 12, 1951.
Wilkinson & Wilkinson, New Orleans, for plaintiff and appellee.
Clem H. Sehrt, Edward J. Boyle and Thomas M. Brahney, Jr., all of New Orleans, for defendants and appellants.
McBRIDE, Judge.
On August 4, 1947, while the plaintiff, James Richardson, was assisting Edward L. Crochet in dipping a trawl net in a solution called "Pacific Ocean Net Preservative," which had been purchased by Crochet from Vincent DeLuca Hardware Company, Inc., the solution suddenly ignited and severely burned Richardson and Crochet. They both filed suits against the vendor and its president, John B. DeLuca, Sr., who made the sale. The suits were consolidated for the purpose of trial, and after hearing the two cases on the same evidence, separate judgments were rendered in favor of the plaintiffs and against the defendants. Richardson recovered $2,500.00, from which judgment the defendants have appealed, and that appeal is now before us for consideration.
*200 Richardson alleges that the preparation contained about sixty per cent pine tar and forty per cent benzol, which was capable of igniting, flashing, and exploding from a spark or flame located as much as fifty feet and even farther from an open container holding the mixture. It is alleged that neither Crochet nor Richardson was aware, until the explosion occurred, of the presence of benzol in the solution, and that they were also unaware of any characteristic of said solution to flash, ignite, and explode from a remotely located spark or flame, and that there was no direct or indirect circumstance through which the said parties should have been aware of the said characteristic of the solution. The gist of the charge of negligence is that the defendants gave no adequate warning of the combustible qualities of the mixture. Defendants, after denying negligence, specifically averred that Crochet, who made the purchase of the solution, was given a verbal warning as to its combustible qualities, and that there was printed on the label affixed to the can containing the solution the words, "Keep away from fire or heat." Defendants, in the alternative, plead that if there was negligence on their part, the contributory negligence of Richardson and Crochet bars their recovery.
The judge a quo prefaced his reasons for judgment with the two following questions: (1) "Did plaintiff Crochet have adequate warning of the contents and nature of Pacific Ocean Net Preservative?" and (2) "Did plaintiffs use the solution as ordinary individuals would, under the circumstances?"
There is no dispute whatever that "Pacific Ocean Net Preservative" is composed of about two-thirds coal tar and about one-third benzol. According to the expert testimony, benzol is a white, highly volatile liquid obtained from the distillation of bituminous coal. The liquid, when brought into contact with flame or close to a flame, will ignite and burn.
Independent of the vapor which it may give off, the liquid is not explosive. Benzol will give off fumes according to its temperature, vaporizing more rapidly as the temperature rises. We are told by plaintiff's expert that benzol's flash point runs upward from minus sixteen degrees Fahrenheit, or, in other words, sixteen degrees below zero. On the other hand, defendants' expert testified that the flash point is from ten degrees Fahrenheit upward. The flash point is that temperature at which a liquid gives off fumes which are ignitable in solution with the oxygen in the air. We understand from the record that the vapors or fumes of benzol are 2¾ times heavier than air, and flow over the side of the receptacle in which the liquid is contained, go to the ground, and are then pushed forward by the continous vaporization. In other words, as evaporation continues, the vapors along the ground spread over a widening area. Such vapors, rather than being drawn up into the air and lost, when coming into contact with fire would act as a fuse, and the fire would travel back over the fuse to the liquid itself; but the liquid and the fumes will not ignite spontaneously. Plaintiff's expert, in comparing the combustible qualities of benzol with gasoline, stated that benzol has a rating or classification of from 95 to 100 for explosive potentialities, while the classification of gasoline is from 90 to 100. This is disputed by the defendants' expert, who testified that the hazard rating of gasoline and benzol is alike, being from 90 to 100.
The expert testimony shows that benzol, notwithstanding its high volatile and combustible characteristics, is used widely in the preparation of many products, such as lighter fluids, cleaner fluids, and as a thinner for paints and varnishes, and also in paint and varnish removers.
DeLuca, Sr., testified that the product had been manufactured for from twelve to fourteen years, and that, although thousands of gallons had been sold, no complaint had ever been received regarding an accident, except the one which took place in Crochet's yard. Eight witnesses testified that they had been purchasing the net dipping solution from the defendant corporation for years, without untoward incident.
At approximately 1:30 on the afternoon on which the accident occurred, Crochet purchased five gallons of "Pacific Ocean Net Preservative" from the defendant corporation, *201 through John B. DeLuca, Sr., who acted as salesman.
Crochet and DeLuca disagree as to exactly what took place and what was said at the time of the sale. It is conceded that Crochet had never before dipped a net. DeLuca's testimony is that Crochet came into the store and asked for pine tar, but although the store did not carry that product in stock, DeLuca explained to Crochet that pine tar mixed with hot water was an antiquated solution for dipping nets. DeLuca states that he told Crochet that he had pine tar oil, but that Crochet stated he wanted pine tar so that he could mix it with hot water. DeLuca then repeated that he had pine tar oil and that if Crochet wanted it he could sell it to him, but that pine tar oil would take from six to ten days to dry. According to DeLuca, Crochet then said, "No, I don't want that; I want it to dry quick; I want to use my net tomorrow." At any rate, DeLuca informed Crochet that there was a product manufactured by the defendant corporation known as "Pacific Ocean Net Preservative," widely sold to fishermen, which would dry quickly. Crochet bought a five-gallon can of the preparation. The can was a secondhand tin container, which had previously contained a well-known brand of vegetable oil, the original label being still affixed. On one side of the can was pasted the label used by defendant corporation in merchandising its "Pacific Ocean Net Preservative," which label measured 11½ by 6½ inches.
There was undoubtedly some discussion regarding the solution. DeLuca claims that he told Crochet how to use it to get the best results, and warned him not to use it near fire or heat, nor to smoke or permit anyone around him to smoke, and that he pointed to the admonition printed in large black letters on the extreme bottom of the label, "Keep away from fire or heat." Crochet admits having received instructions as to the use, and also that DeLuca told him not to smoke nor to permit anyone around him to smoke while the solution was being used, but he denies that he was instructed to keep it away from fire or heat. He denies also that he was shown the label, and denies that he ever read what was on the label.
At approximately 6:30 in the evening of the same day, Crochet, assisted by Richardson, engaged in the dipping of a shrimp trawel net into the five gallons of the solution, which had been placed in a washtub in an open yard of the Crochet combination residence and restaurant, when suddenly there was a flash and the solution in the tub ignited. Both Richardson and Crochet deny that they were smoking or that they had any fire or flame on their persons. If this be true, the fire was undoubtedly caused by a flash ignition spanning intervening space from a more remote source of ignition. It is admitted that there was in a shed in the yard a butane gas burner consisting of twelve ¾ inch burners in the shape of a cross, about a foot long, producing sufficient heat to boil ten to twelve dozen crabs at one time. At the time of the fire, the gas burner was in operation, and crabs had been boiled thereon since four o'clock in the afternoon.
The fire took place in the yard, which is bounded by a fence on one side and by the rear of the shed on the other side. The yard area was approximately ten feet wide and twenty-two feet long, and from photographs in the record we notice that there are substantial cracks in the wall of the shed.
There is a disagreement between Richardson and Crochet as to exactly where the tub was located at the time of the fire. The trial judge found as a fact that at no time was the tub ever nearer the butane fire than ten feet, but we notice in the testimony an admission from Crochet that the washtub was about nine feet from the fire when he poured the solution into the tub.
The net had been allowed to soak in the solution, according to the plaintiff's testimony, for about one hour, as DeLuca had instructed. Richardson and Crochet were in the process of removing the net from the tub and hanging it on a fence to dry, when the fire occurred. Assuming that the net had soaked for one hour, there undoubtedly would have been a large amount of the gaseous vapor in the vicinity of the tub. The defendants' expert witness testified that *202 within the hour all of the benzol in the mixture should have evaporated, as the day was extremely warm, the record showing conclusively that the temperature was ninety-two degrees. This witness made demonstrations during the trial below which are convincing that benzol rapidly vaporizes. A small quantity of the fluid was placed into the lid of a small metal box, and according to the judge's remarks dictated into the record, the liquid entirely vaporized in from three to four minutes.
It was the holding of the trial judge that in view of the vagueness of the label, the secondhand container, the method of merchandising, the meager verbal instructions, and the fact that the properties or components of the solution did not appear on the label, the defendants were guilty of negligence, and that both plaintiffs, who were without fault, are entitled to recover.
In the written reasons for judgment, certain passages are quoted from Corpus Juris, Corpus Juris Secundum, American Jurisprudence, and from authorities emanating from other jurisdictions, all to the effect that the seller of an explosive substance, knowing its nature, must give to the purchaser notice of its dangerous character, by a proper label or otherwise, or he will be liable for injuries resulting to innocent persons who are not themselves at fault.
We have carefully studied the authorities quoted, as well as those mentioned in appellees' brief (one from Louisiana), but we cannot see how they can possibly be controlling in the instant case.
Although denying that he had knowledge of the component ingredients contained in the solution, and that it was volatile and combustible, or that he read the label on the can, Crochet admitted that he was specifically warned not to smoke around the solution nor to allow anyone else to do so. We see no negligence in the defendants in not stating on the label the ingredients used in the solution, as Crochet freely admitted that he did not know what benzol was because he had never seen or heard of it before. He did know, however, even if it be true that he did not read the label, that the contents of the can were inflammable. On cross examination, he admitted that the verbal admonition given him not to smoke or permit anyone else to smoke indicated to his mind that the solution was "explosive." While the extent of Crochet's educational background is not shown, the transcription of his testimony reflects that he is an intelligent individual, and we fail to comprehend what more of a warning should have been given by DeLuca, when Crochet admitted he understood its import.
We attach no importance to the circumstance that the defendant corporation dispensed its product in secondhand cans which bore the label of the original user. The original labels are absolutely dissimilar to the label "Pacific Ocean Net Preservative," which is of a bright yellow color, upon which are printed the words "Keep away from fire or heat," in one-half inch black letters enclosed within a rectangular border. The lettering of the words in question are the largest on the label, with the exception of the name of the product. From our position on the bench, we could readily read the label while the case was being argued. The distance from our position to counsel table is about twelve or thirteen feet.
Richardson frankly admitted that he read the label and noticed the instructions to "Keep away from fire or heat," and there is no question that he had knowledge of the dangerous nature of the dipping solution. He denied knowing that the crab cooker was in operation, although it was only about ten feet away from the tub, and it would be asking us to tax our credulity to believe that he did not know of the crab boiling operation or feel the heat emitted from such a sizeable burner on that hot August day.
We think that if the plaintiffs had acted as prudent men, they would have heeded the verbal instructions and the warning on the label, that the solution should be kept at a safe distance from fire or heat, and undoubtedly under the circumstances the unfortunate accident was brought about through their own lack of care.
In the comparatively recent case of Mercury Ins. Co. v. Hodges, La.App., 199 So. *203 526, 529, we were confronted with facts involving the question of whether one who used a volatile substance near a flame was guilty of negligence. One of the defendants was a contractor, who at the time of the fire was engaged in carrying out a contract for the refinishing of certain floors in an apartment. It was shown that the floors were being "filled" with a composition made by dissolving a putty-like substance in gasoline, and that this composition had been spread on the floor just before the fire started. The material had not been used on the floor of the kitchen, in which there was a stove and an automatic water heater, but had been spread on the floor of an enclosed sleeping porch which adjoined the kitchen, and it appeared that the door between the porch and the kitchen was open. Near the open door was an automatic water heater, which was equipped with a pilot light customarily burning at all times. We held the contractor guilty of negligence and cast him for the amount of damage sustained by the property as a result of the fire,
"(1) In that no care was taken to determine whether the pilot light of the heater was burning when this highly inflammable material was spread on the floor, and,
"(2) In that all of the windows were closed when this operation was performed."
We know of no statutory law or jurisprudence in Louisiana requiring any particular type or style of label on a volatile substance such as benzol. The universal rule is that the vendor should be held to a degree of care commensurate with the dangerous potentialities of the product in which he deals, but the defendant corporation was under no duty, under the circumstances of the case as we find them, to do any more than that which was done in the matter of warning its customer. Act 37 of 1877, which counsel for plaintiffs mentioned in argument, has no application, as that statute applies only to the sale or disposition of coal oil, burning oil, or any fluid derived wholly or in part from coal or petroleum used for illuminating or burning purposes.
In view of our holding that there was no negligence on the part of the defendants, we find it unnecessary to discuss the call in warranty, wherein defendants allege that in a certain agreement of compromise Crochet obligated himself to indemnify them for any and all liability to other persons arising out of the accident.
For the reasons assigned, the judgment appealed from is reversed, and it is now ordered, adjudged, and decreed that the suit of James Richardson be dismissed at his cost.
Reversed.