131 So.2d 329 (1961)
Artis A. SINGLETON, Plaintiff-Appellant,
v.
OLIN MATHIESON CHEMICAL CORPORATION, Defendant-Appellee.
No. 304.
Court of Appeal of Louisiana, Third Circuit.
June 19, 1961.
Mitchel M. Evans and W. C. Pegues, III, DeRidder, for plaintiff-appellant.
Thomas F. Porter & John B. Scofield, by John B. Scofield, Lake Charles, for defendant-appellee.
Before FRUGE, HOOD and CULPEPPER, J.
FRUGE, Judge.
This is a suit in tort against defendant, Olin Mathieson Chemical Corporation, for injuries sustained by plaintiff when a shotgun shell, manufactured by defendant, *330 allegedly exploded in plaintiff's shot gun. From a judgment in favor of defendant and against the plaintiff rejecting his demands at his costs, plaintiff prosecutes his appeal.
Plaintiff owns a twelve gauge "Berkshire" double-barrel shot gun. During the fall of 1957 he purchased a box of 25 Winchester twelve gauge Ranger shot gun shells, serial no. A57M691P. While squirrel hunting on October 11, 1958, he loaded the "Berkshire" gun with the shells and shot at a squirrel, whereupon the right barrel burst causing certain injuries to the fingers of his left hand. For cause of action plaintiff alleged that the shells were defective; that one had "exploded" in the chambers; that defendant had breached its "warranty of materials and workmanship" by carelessly and defectively manufacturing the shells; and that the sole proximate cause of the injuries was defendant's negligence in its manufacturing process and/or selection of material and workmanship resulting in the defective shell. Res ipsa loquitur was plead alternatively. Defendant entered a general denial and affirmatively alleged that the injuries were caused by plaintiff's gross negligence in that:
"(a) Notwithstanding the plaintiff had full knowledge that the said Berkshire shotgun, Serial No. T32 21536, was old and dangerously worn, and that it was highly dangerous to fire a Winchester Ranger shell in said gun, he knowingly and intentionally did fire such shell in his said gun.
"(b) Having full knowledge that the said Berkshire shotgun, Serial No. T32 21536, was not originally made in such manner and with such materials as to be strong enough to have fired therein said Winchester Ranger Shells, and knowing that it would be highly dangerous for him so to do, he nevertheless fired said shell in said gun".
Alternatively, defendant averred that if the court found it negligent then plaintiff was contributorily negligent in the above quoted particulars.
On appeal plaintiff alleges error in the court below in failing to find the defendant negligent in its manufacturing process and/ or selection of materials and workmanship in producing a defective shell; in failing to find that defendant breached its warranty of materials and workmanship; in failing to find defendant negligent in that an insufficient warning was given as to the dangerous characteristics of the shells; and in failing to apply the doctrine of res ipsa loquitur.
Negligence and breach of Warranty
The trial judge reviewed the evidence extensively in his well-written reasons for judgment. We have carefully read the transcript of testimony, examined the evidence offered and have concluded that defendant was not negligent in its manufacturing process and/or selection of materials and workmanship. Furthermore, it does not appear that the shell was defective. The lower court found that:
"No one other than the plaintiff was present at the time and place of the accident and plaintiff alone testified as to what he did or saw about the gun immediately prior to the explosion. Plaintiff testified that he bought the Berkshire gun in question in 1952, and prior to that time he had purchased and used 12 guage Ranger shells in other guns owned by him. He continued using the same type shells after he purchased the Berkshire gun. In the Fall of 1957, he purchased a box of 12 guage Ranger shotgun shells manufactured by defendant from a retail dealer in DeRidder, Louisiana. He kept these shells on a shelf in his kitchen. While squirrel hunting on October 11, 1959, he loaded his gun with two of the shells, fired the right barrel resulting in a rupture of the barrel some fourteen inches from the breach and causing the injury to the fingers of his left hand. That shot was the only shot made by plaintiff on the date of the accident. The box containing the shells was offered in evidence by plaintiff and *331 marked "P-1". On one end of the box on the outside is printed the following words:

"`Warranty
"[`] We warrant the materials and workmanship in these shotgun shells to be of Winchester standard quality.'
"On the opposite end of the box on the outside is printed the following words:

"`Warning
"[`] These shells should be used only in guns in good condition. Do not use them in arms having Damascus or twist steel barrels or arms chambered for shells shorter than shell length printed on this carton.'
"The word `Warning' is in white capital letters imprinted over a red background and the words that follow are printed in blue over the red background in the same size type as the warranty. Both the warranty and the warning are easily readable.
"On cross examination plaintiff stated that he was 57 years of age; that he read his Bible daily; that he taught a Sunday School Bible Class; that he read his Sunday School Quarterly; that he read the newspapers, demonstrating in open Court his ability to read; that he had been hunting all of his life; and that he had never read the warning printed on the box of shells.
"The uncontradicted testimony of plaintiff's own witnesses, Crysel, and of defendant's experts, Hill, McLain and Houser, is that the gun in question is in fact an old, twist steel Damascus made gun, the manufacture of which type guns was discontinued about the turn of the century. This type gun was made by twisting small steel rods around a mandrel, then subjecting them to intense heat to weld the rods and hammering them while they were hot. The mandrel was then withdrawn and the work smoothed or polished. All the experts who testified agreed that the Damascus type gun is inferior to the construction used in the manufacture of modern guns and none of them would fire a Damascus gun, even if it were new, because to do so would be unsafe. All of defendant's expert witnesses testified, and a casual inspection will show, that the gun was old and rusty, the barrels were pitted, the stock was broken and held together in part by a steel band around the stock in front of the trigger guard placed there by plaintiff's witness, Crysel, and the general condition was poor. The gun was offered in evidence as Defendant's exhibit D-1 and it is apparent to the Court, who is not an expert, that the gun was, in fact, unsafe. The experts who testified could not determine the exact date of manufacture of the gun, but since the manufacturers discontinued making this type gun around the turn of the century, as they testified, the particular gun in question must have been made before the year 1900. The experts also testified that deterioration in Damascus made guns takes place merely by the passage of time since slag which is bonded in between the welds when the twists of metal are hammered together on the mandrel will absorb moisture, thereby speeding corrosion in the barrel. This corrosion weakens the welds and tends to pull them apart.
"Plaintiff offered no evidence to show that the shell in question which resulted in the rupture of the barrel was overloaded, improperly manufactured, or in any wise defective, and in that respect he has failed to make out his case, unless the doctrine of res ipsa loquitur applies. In spite of plaintiff's lack of evidence, the defendant, in the Court's opinion, has shown by uncontradicted testimony that the shell was not, and *332 could not, have been overloaded, and that there was no defect in the shell or the manufacturing process. Mr. Hill, a witness for defendant, described in detail the mechanical process used in the manufacture of shotgun shells, with illustrative drawings and charts, and the Court is convinced from his testimony that the machine used in the manufacturing process could not possibly produce an overloaded shell. The inspection processes were also described in detail by this witness, both while the shell is being assembled and manufactured and after the shell has been loaded, and from those inspection processes, mechanical, visual and manual, any shells showing abnormalities, imperfections, improper crimping or too much wax are promptly discarded.
"There were six shells left in the box from which the plaintiff testified that he took the shell which caused the eruption in his gun when it was fired. These six shells were turned over to the defendant before the trial for testing, which was done under the supervision of the witness Hill. Hill's testimony shows that each of the six shells were carefully unloaded, the powder and shots in each shell were carefully weighed, the wads checked and it was found that the weights of the powder and the wads in each shell were normal. The loads of each shell were carefully reloaded in the same shells and then test fired to determine the pressure generated by each of the six shells. The results of the pressure tests, which are in the record as defendant's Exhibit D-19, showed that the six shells were all normal. Hill testified further that his department has charge of the loading and testing of shells and in his 23 years of service with the defendant company he has never known or heard of an overloaded shell being turned out by his company.
"The uncontradicted evidence is that the shell in question which caused the rupture was not, and could not, have been overloaded.
"Defendant produced testimony showing that it had conducted tests to determine what part of the barrel of a shotgun would rupture as a result of an overloaded shell, purposely hand loaded and test fired such overloaded shells in shot guns and from these tests it found that where explosions were caused by overloaded shells, the barrel ruptured at the breach end of the barrel, and not at any other place closer to the muzzle of the gun. A diagram of such pressure tests was introduced in evidence as defendant's Exhibit D-15. The reason there is a rupture at the breach end of the gun from an overloaded shell is that the maximum pressure generated by the firing of the shell is exerted at the breach, which is brought about by the rapid burning of modern powder. The pressure chart shows that when a shell, which was purposely overloaded with a powder charge two and one-half times more than normal, was fired, the pressure at a point fourteen inches down the barrel from the breach, being the distance from the breach that plaintiff's gun was ruptured, was normal, although the pressure at the point of rupture was five times as high, the point of rupture being the breach end of the barrel. Consequently, there can be no doubt from the evidence that the rupture in plaintiff's gun was not caused by an overloaded shell, and such rupture was most likely caused by foreign matter such as dirt or part of a cleaning rag in the barrel of the gun at such point, or by the faulty, weak and unsafe condition of plaintiff's gun."
Plaintiff contends in effect, that if it was impossible, (and if not impossible, then highly improbable) that a defective shell would be manufactured then this was negated by the fact that defendant performed frequent and periodic mechanical, physical and visual tests on the shells. We *333 find no merit in this argument. The manufacturer of shells, an explosive, has a duty of care to the consuming public that requires these safeguards. These tests are not performed due to a lack of faith in the end-product, but rather out of an abundance of caution prompted by a realization of the devastating effects of shells when improperly manufactured and improperly used.

Warning
Considering the contention that defendant did not adequately warn of the dangerous characteristics of the shell, we find no merit therein, for as the trial judge found:
"In his brief plaintiff argues that the warning printed on the box of shells was inadequate. There is no merit in that contention. In the first place, plaintiff testified that he did not even read the warning on the box although he had been using Ranger shells manufactured by defendant for many years. The Court has no hesitancy in concluding that the warning printed on the shell box was adequate and had plaintiff read it he would have been sufficiently warned. All of the evidence shows that plaintiff's gun was, in fact, a twist steel, Damascus made gun, and the evidence is overwhelming that the gun was old, rusty, in generally poor condition and unsafe for use. The warning not to use the shells in that type gun was clear and conspicuously placed on the box `These shells should be used only in guns in good condition. Do not use them in arms having Damascus or twist steel barrels or arms chambered for shells shorter than shell length printed on this carton'. Plaintiff's argument is that the warning should have gone further and stated that if such shells were used under those conditions injury might result. In Richardson v. DeLuca, 53 So.2d 199 (Orleans Appeal Court 1951), plaintiffs sued for personal injuries resulting from the explosion of a net preservative solution. The label on the container stated:
"`Keep away from fire or heat'.
"Plaintiffs were also told verbally not to smoke while using the solution. Plaintiffs used the solution at a distance of about ten feet from a crabcooker and the solution exploded.
"The court found that plaintiffs had been sufficiently warned, even though not apprised of the consequences.
"In United States v. Inmon, 205 F.2d 681 (Court of Appeal, 5th Circuit, 1953), it was held that a fourteen year old boy, who was injured by blasting caps, was sufficiently warned by the printing on the cap cartons which read: `Blasting capsdo not carry loose in your pocket'
"In Smith v. United States [D.C.], 155 F.Supp. 605, a seventeen year old boy was injured while attempting to dismantle a fuze which he and a companion had found in a box near railroad tracks. The following warning appeared on the box:
"`24 FuzesHandle Carefully' and `Detonating Fuze Handle Carefully Do not Store or Load with Any High Explosive.'
"The Court held that the warning was adequate and recovery was denied.
"It is the Court's conclusion that the warning printed on the shell box was adequate and entirely sufficient. The plaintiff paid no attention to ithe never read it.
Although plaintiff has cited several cases in support of his position we will discuss only two of themthe others being distinguishable, inapplicable or of no benefit to plaintiff's cause. The first of these is concerned with the use of carbon tetrachloride, Tampa Drug Co. v. Wait, Fla., 103 So. 2d 603, wherein adequacy of warning of deadly effects of carbon tetrachloride was the prime question since there was no *334 warning of the deadly effects on the label. Patently, this case is distinguishablecarbon tetrachloride is a deadly chemical compound, as an explosive is equally deadly. However, relatively few laymen know what carbon tetrachloride is, let alone what its potential danger is, especially where you are merely warned to avoid "prolonged or repeated" contact with the skin, to use adequate ventilation and not to take internally. The warning in the case at bar was calculated to warn owners of "Damascus" or twist steel type guns. The warning stated that these shells were not to be used in said guns. The danger involved is obvious in the use of a shotgun shell in this set of circumstances, whereas the danger in the use of carbon tetrachloride is not patently obvious. Moreover, in the case at bar plaintiff admittedly did not read the warning. Therefore, the fact that the warning did not state that injury would occur is irrelevant. The law does not require that one undertake to do a vain and useless thing, but only to do that which is reasonable under the circumstances. Hence, in view of the fact that plaintiff did not read the warning, a warning to the effect that he would possibly be injured if he used the shell in his gun would have been of no avail. Where defendant failed to warn of the danger of carbon monoxide fumes in the cockpit of an airplane during emergency fire fighting and as to the precautionary measures that could be taken, this failure was actionable negligence. See De Vito v. United Air Lines, D.C., 98 F.Supp. 88. In that case there was a failure to warn of a danger that was not obvious. Here the danger was obvious as stated above. Therefore, we hold that where the consequences of improper usage are such that they will be readily cognizable there is no duty to warn of the particular consequences that may flow therefrom. Hence, the warning was adequate.

Res Ipsa Loquitur
The lower court found that under the circumstances of this case the authorities relied on by plaintiff in support of the doctrine of res ipsa loquitur were inapplicable and that even if they were applicable, plaintiff did not sustain the "burden of establishing from all the evidence, including the `inference' of negligence from the doctrine, that defendant's negligence caused the accident." He found that "plaintiff produced no evidence of negligence on the part of the defendant; on the contrary, the defendant has shown affirmatively that there was no negligence on its part."
Chief Justice Fournet, in Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389, with adequate citation of authority, related the practical effect of the doctrine. Commencing at page 391 of 97 So.2d he stated that:
"A determination of a proper instance for application of the principle of res ipsa loquitur has been the subject of volumes of discussion by learned jurists and legal scholars, who have been at pains to point out that the maxim means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that the rule rests for its justification upon the common experience that accidents from such causes do not commonly occur in the absence of negligence; and that it is the lack of direct evidence indicating negligence on the part of the defendant as the responsible human cause of a particular accident which actually furnishes the occasion and necessity for invoking the rule in its strict and distinctive sense. It is generally conceded that res ipsa loquitur in no way modifies the rule that negligence will not be presumed. The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke *335 the rule, an inference of negligence, thereby obtaining an advantage and placing on the defendant the burden of going forward with proof to offset that advantage. When all the evidence is in, the question is still whether the preponderance is with the plaintiff. All that is meant by res ipsa loquitur is `that the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty.'

"Many instances are noted where the doctrine, though invoked, has no application; e. g., it is obvious that when there is, in addition to evidence disclosing the physical cause of the accident, either direct or circumstantial evidence which conclusively repels any inference of negligence that might otherwise arise, the plaintiff is deprived of any pratical advantage from the rule. Nor is a resort to res ipsa loquitur warranted in cases where the existence of negligence is an immaterial issue, such as cases dealing with food and drink for human consumption since the manufacturer insured his product to be free from taint or injurious substances; or where the opposing parties or their witnesses are present and direct testimony as to the cause of the accident is available; and an accident due to a collision between two private vehicles is not, in the absence of further proof a proper occasion for application of the rule, since it is improper to assume that one driver, rather than the other, was negligent, or to ignore the fact that the collision might have been caused by factors outside the control of either. It necessarily follows that the maxim is not appropriate where, from the nature of the facts, it is reasonable to assume that the actions of the defendant may have been caused by the negligence of another. In the case of Morales v. Employers' Liability Assur. Corp., 202 La. 755, 12 So.2d 804, this Court aptly stated: `It is the duty of the plaintiff to prove negligence affirmatively; and, while the inference allowed by the rule of res ipsa loquitur constitutes such proof, it is only where the circumstances leave no room for a different presumption that the rule applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails and it can not be invoked.' 202 La. at page 769, 12 So.2d at page 808." (Emphasis added. See footnotes therein for cases.)
The defendant has shown that the accident did not result from a defective shell, etc. It did show that the most likely cause of the accident was the type gun in which the shell was fired. Furthermore, as pointed out by the trial judge, it could have been caused by "foreign matter such as dirt or part of a cleaning rag in the barrel of the gun at such point, or by the faulty, weak, and unsafe condition of plaintiff's gun." Thus the doctrine of res ipsa loquitur is inapplicable under the facts in the case at bar. See Larkin v. State Farm Mutual Automobile Insurance Company, supra; Shields v. United Gas Pipe Line Co., La.App., 110 So.2d 881 and Bauer v. Columbia Casualty Company, La.App., 126 So.2d 398. Moreover, the trial judge disposed of the plaintiff's contention that the doctrine of res ipsa loquitur was applicable as follows:
"The doctrine of res ipsa loquitur is based in part upon the theory that the defendant either knows the cause of *336 the accident or has the best opportunity of ascertaining it, that plaintiff has no such knowledge, and therefore is compelled to allege negligence in general terms and to rely upon proof of the happening of the accident in order to establish negligence. The inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause of the accident is practically accessible to the defendant but inaccessible to the injured person. If the circumstances do not suggest or indictate superior knowledge or opportunity of explanation on the part of the defendant, or if the plaintiff has equal means of information the doctrine does not apply. Again, when it is shown that the accident might have happened as the result of one of two or more causes, the doctrine does not apply. Larkin v. State Farm Mutual Automobile Ins. Company, 233 La. 544, 97 So.2d 389; Morales v. Employers Liability Assurance Corporation, 202 La. 755, 12 So.2d 804; Shields v. United Gas Pipe Line Company [La. App.], 110 So.2d 881.
"In the present case plaintiff knew, or should have known that his gun was a twist steel barrel Damascus make, some sixty years old, with pitted and rusty barrels, in poor and unsafe condition, with a broken stock held together with makeshift repairs, and warned by the defendant not to use the shells purchased by him in such a gun. The evidence is overwhelming that the shell used in the gun was not overloaded or defective, and consequently the doctrine of res ipsa loquitur is not applicable in this case. The Court has examined the authorities cited by plaintiff in his brief on the doctrine of res ipsa loquitur, but under the circumstances of the case at bar and the evidence produced, those authorities are not applicable. Even though the doctrine is applicable, the plaintiff cannot recover unless he sustains the burden of establishing from all of the evidence, including the `inference' of negligence from the doctrine, that defendant's negligence caused the accident. * * * [Here the trial judge quoted that part of the Larkin case, supra, pertaining to the inference of negligence to be drawn from the doctrine.] * * *
"Plaintiff produced no evidence of negligence on the part of the defendant; on the contrary the defendant has shown affirmatively that there was no negligence on its part." (Brackets supplied.)
For the foregoing reasons the judgment appealed from is affirmed. Costs to be paid by plaintiff-appellant.
Affirmed.