No. 54,176

LARRY KEITH MAYS, *Appellant,* v. CIBA-GEIGY CORPORATION, MISCO-UNITED SUPPLY, INC., and GRAVES DRILLING COMPANY, INC., *Appellees,* and DOC'S BACKHOE SERVICE and CIMARRON INSURANCE COMPANY, INC., *Intervenors.*

(661 P.2d 348)

Opinion filed March 26, 1983.

*Richard D. Greene* and *Jeffery L. Carmichael,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Dennis M. Feeney,* of the same firm, was with them on the briefs for appellant.

*Alvin D. Herrington,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause, and *Eric E. Davis* and *Randall E. Fisher,* of the same firm, were with him on the brief for appellee Ciba-Geigy Corporation.

*Larry Withers,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Arthur S. Chalmers,* of the same firm, was with him on the brief for appellee Misco-United Supply, Inc.

*Steven C. Day,* of Turner & Boisseau, Chartered, of Wichita, was on the brief for appellee Graves Drilling Company, Inc.

The opinion of the court was delivered by

McFARLAND, J.: In this action plaintiff Larry Keith Mays seeks recovery for personal injuries suffered when a gas pipeline system on which he was working exploded. Theories advanced for liability of the various defendants include negligence, manufacturing defect, failure to warn, and breach of express warranty. The trial court entered summary judgment in favor of each defendant and plaintiff appeals therefrom.

## PRELIMINARY FACTUAL STATEMENT

A number of complex issues are raised, several of which involve intensive scrutiny of different facets of the factual circumstances herein. We believe it would be appropriate at this point to state only a preliminary factual framework which identifies the parties and their relationship to this controversy as well as the basic facts of what occurred. Factual details will be set forth in the opinion as needed.

Plaintiff Larry Keith Mays was an employee of intervenor, Doc's Backhoe and Roustabout Service, a sole proprietorship owned and operated by Mr. Donald "Doc" Dale and located in Attica, Kansas. On December 18, 1976, Doc's Backhoe and Roustabout Service was engaged in connecting a new gas well to an existing separator on property located three miles south of the town of Murdock, in Kingman County, on what is referred to as the Kostner lease. The leasehold property already had two producing gas wells and the third was complete except for connection to the separator, some 1,200 feet from the new well. This new well is referred to as Kostner No. 3.

After digging the ditch, installing the pipe, and making all the connections, Doc Dale checked the line for defects and proceeded to test the new pipeline system. Plaintiff was directed by Dale to remain near the separator and read the pressure gauge. As gas surged through the pipeline system on the test, the line whipped up and an explosion ensued. Plaintiff was engulfed in flames and severely burned.

Defendant, Graves Drilling Company, Inc., was the producer-operator of the lease but had no ownership interest therein. Graves had served as the drilling contractor on the new well and had hired a completion rig to be moved onto the site. After the completion work was finished, Graves hired Doc Dale to connect the new well to the separator. This type of work was frequently done by Dale as a part of his business.

Doc Dale purchased most of the materials utilized on this job from defendant Misco-United Supply, Inc., an oil field supply company located in Medicine Lodge. Included within those purchases were fiberglass pipe, adaptors and epoxy glue which had been manufactured by defendant Ciba-Geigy Corporation.

Numerous errors in the installation and testing procedures utilized by Dale were established. They include:

1. Use of a low-pressure nipple in the pipeline system which required a high-pressure nipple;
2. Failure to backfill or pin the fiberglass pipe between connections prior to testing;
3. Failure to thruster-block the elbows of the pipe prior to testing;
4. Failure to test the system with a nonflammable substance; and
5. Failure to turn off open flames on separator and heater prior to testing.

## AFFIDAVITS

The first issue on appeal is whether the district court erred in striking portions of three affidavits attached to plaintiff's memorandums in opposition to defendants Misco and Ciba-Geigy's motions for summary judgment.

Plaintiff's deposition was taken on May 12, 1978. Plaintiff was the only eyewitness as to the movement and rupture of the line. He testified in his deposition the pipe whipped up and broke within five feet either side of the steel-to-fiberglass connection. Five feet on the gas well side of the connection would be in the fiberglass pipe manufactured by Ciba-Geigy. Five feet on the separator side would be in the steel pipe not manufactured by Ciba-Geigy. More than three years later, on September 2, 1981, Misco filed its motion for summary judgment which included some six pages of "uncontroverted facts." On September 16, 1981, Ciba-Geigy filed its motion for summary judgment with 55 detailed "uncontroverted facts." On September 25, 1981, and October 19, 1981, plaintiff filed his memorandums in opposition to the respective summary judgment motions. Attached to the October 19, 1981, response was an affidavit of plaintiff dated October 8, 1981, which stated *inter alia* the pipe broke five feet into the fiberglass side of the connection.

The deposition of Doc Dale was taken on March 27, 1978. In his deposition Dale testified he believed he was well versed and well experienced in operations such as he was engaged in on the accident site. Specific examples of his testimony relative to his belief and reliance in his own expertise in hooking up wells will be set forth in the discussion of Issue No. 5. Further, Dale testified he did not read the Ciba-Geigy package inserts on making the bond of steel to fiberglass connections. The picture that came across was clearly that of a man who thought he knew

all there was to know about hooking up oil and gas wells and did not need to read, and would not read, instruction manuals issued in conjunction therewith.

In his two affidavits, both dated September 21, 1981, and each attached to the respective responses, a very different Doc Dale is portrayed—a man thirsting for knowledge, who, if adequately instructed by defendants Misco and Ciba-Geigy, would have performed all the steps properly and thereby avoided the explosion and resultant tragic injuries to plaintiff.

In determining the issue, Judge Calvert held:

> "The first matters that have to be dealt with are the supplemental affidavits. Those affidavits, to the extent that they are inconsistent with or contrary to the deposition testimony of Doc Dale and Mr. Mays, are stricken. I adopt the holding and the theory of *Radobenko [v.] Automated Equipment [Corporation,* 520 F.2d 540 (9th Cir. 1975)] and *Perma Research and Development [Co. v. Singer Co.,* 410 F.2d 572 (2d Cir. 1969)] cases.
>
> "I conclude, as a matter of law, that a party who has been fully deposed cannot contradict his own prior testimony by affidavit, in order to defeat a motion for summary judgment."

The cases referred to by the district court, *Radobenko v. Automated Equipment Corporation* and *Perma Research and Development Co. v. Singer Co.,* are sound authority for the proposition that a party who has been examined at length on deposition may not raise a fact issue and thereby defeat a summary judgment motion simply by submitting an affidavit contradicting his prior testimony.

Both federal cases involve application of Fed. R. Civ. Proc. 56 which is identical to K.S.A. 60-256. In *Radobenko* the Ninth Circuit affirmed a district court's granting of summary judgment for defendant where plaintiff contended there had been fraud, breach of contract, and breach of fiduciary duties in connection with a stock repurchase option and an employment contract. In order to avoid summary judgment for defendant, plaintiff submitted an affidavit which was at odds with his prior deposition. The district court refused to consider the affidavit. In affirming the lower court, the appellate court noted:

> "Mere allegations, and denials, that the contract was breached, that a fraud was committed, or that some fiduciary duty was breached do not alone establish the existence of a genuine dispute of material fact. Such allegations and denials thereof merely frame the ultimate issues to be determined by applying the relevant rules of law to established facts. Thus, appellants' contention that the existence of these ultimate issues raises questions of fact which bar summary

judgment is without merit. The proper test is whether, upon examination of the proofs appearing in the record, there exists a genuine dispute of material fact.
. . . .

"Examination of the entire record discloses many pages of sworn statements by appellant Radobenko submitted in opposition to the motion for summary judgment. From the welter of conclusionary and argumentative recitals therein, we glean few probative facts. *If there is any issue of fact in the proofs, it exists only because of the inconsistent statements made by Radobenko the deponent and Radobenko the affiant.* Thus, we are presented with the question of whether contradictory testimony of a plaintiff alone can be used by him to defeat a defendant's summary judgment motion where the only issue of fact results from the necessity of choosing between the plaintiff's two conflicting versions." 520 F.2d at 543-44. (Emphasis supplied.)

After reviewing the conflicts between the deposition and affidavit, the federal appellate court declared:

"While the facts embraced in these three recitals are both material and relevant to the issues raised by the pleadings, we reject appellants' efforts to characterize them as *genuine* issues of fact. . . .

"The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial. *Suckow Borax Mines Consolidated, Inc. et al. v. Borax Consolidated, Limited et al.,* 185 F.2d 196, 205 (9th Cir. 1950). Here we are convinced that the issues of fact created by Radobenko are not issues which this Court could reasonably characterize as genuine; rather, they are sham issues which should not subject the defendants to the burden of a trial. Thus, we hold that the District Court properly found that there was no genuine issue as to any material fact." 520 F.2d at 544.

The other case relied on by the district court, and also cited in *Radobenko,* was *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572. In *Perma Research* plaintiff brought an action contending he was fraudulently induced to enter into a contract with defendant. In an affidavit filed to forestall partial summary judgment for defendant, plaintiff stated he had been advised by defendant that defendant had no intention of performing the contract. Plaintiff's affidavit was inconsistent with his prior deposition where he had said he had no way of knowing what defendant's intentions were when the contract was executed. The district court granted partial summary judgment for defendant. In affirming, the Second Circuit Court of Appeals observed:

"If there is any dispute as to the material facts, it is only because of inconsistent statements made by Perrino the deponent and Perrino the affiant." 410 F.2d at 578.

## Continuing:

"Nor is this a case where the contradicting affidavit can fairly be said to contain evidence 'newly discovered.' *If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.* Cf. Dressler v. MV Sandpiper, 331 F.2d 130 (2d Cir. 1964)." 410 F.2d at 578. (Emphasis supplied.)

## Concluding:

"The object of summary judgment is 'to discover whether one side has no real support for its version of the facts,' Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 498 (2d Cir. 1962), and thereby to avoid unnecessary trials. We recognize that summary judgment was never intended to be a substitute for trial by jury where the parties 'really have issues to try.' Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 621, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944). We recognize also that there may be some instances where summary judgment is too blunt a procedural device for deciding difficult cases. See, for example, Miller v. General Outdoor Advertising Co., 337 F.2d 944 (2d Cir. 1964). Nonetheless, summary judgment cannot be defeated by the vague hope that something may turn up at trial. Radio City Music Hall Corp. v. United States, 135 F.2d 715 (2d Cir. 1943). Since neither the Perrino deposition nor the Perrino affidavit raises any issue which we can call genuine, and since the allegations of fraud amount to little more than allegations on non-performance, we hold that Judge Bryan properly granted summary judgment dismissing the fraud claims." 410 F.2d at 578.

*Radobenko* and *Perma Research* do not stand as isolated examples for the proposition a party may not use a contradicting affidavit against his own prior deposition testimony. See also *Holifield v. Cities Service Tanker Corp.,* 421 F. Supp. 131, 136 (E.D. La. 1976), *aff'd* 552 F.2d 367 (5th Cir. 1977), and *Bryant v. Western Elec. Co., Inc.,* 572 F.2d 1087, 1088 (5th Cir. 1978).

The *Radobenko-Perma Research* rationale is consistent with Kansas law. In *Powell v. City of Haysville,* 203 Kan. 543, 455 P.2d 528 (1969), defendant was granted summary judgment in an action for personal injuries. Plaintiff moved to set aside the judgment. In so moving plaintiff filed an affidavit which was at odds with his, and his doctor's, prior deposition testimony. In affirming the lower court's summary judgment for defendant, we stated:

"Plaintiff asserts that his affidavit filed in support of his motion to set aside the summary judgment creates a fact question in that he denied he was told of a connection between his lung condition and his work with lime, alum and chlorine. The effect of his affidavit is an attempt to impeach the testimony of his

own doctor. Further, plaintiff's own testimony conclusively shows that he knew his exposure to dust, under the conditions he related, adversely affected his condition and caused the severe attack in 1965.

"Except under conditions not prevailing here, *plaintiff may not by his subsequent affidavit impeach his previous testimony upon deposition* or the testimony of his attending physician and sole medical expert. (*Amerine v. Amerine, Executor,* 177 Kan. 481, 280 P.2d 601 [1955], and *Steele v. Woodmen of the World,* 115 Kan. 159, 222 Pac. 76 [1924].)" 203 Kan. at 549. (Emphasis supplied.)

See also *Sade v. Hemstrom,* 205 Kan. 514, 521, 471 P.2d 340 (1970).

Plaintiff's argument the affidavits are not inconsistent with the deposition testimony is wholly without merit. The affidavits were in direct conflict with the prior sworn testimony on extremely material facts relating to crucial issues, particularly insofar as the Dale affidavits were concerned.

Next, plaintiff likens the situation herein to that in *Kennett-Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir. 1980). *Kennett-Murray* is, as noted in the decision, distinguishable from the *Radobenko* and *Perma Research* cases.

In *Kennett-Murray* an employer brought suit against a former employee to recover on a promissory note and an employment contract. On February 23, 1978, the defendant employee was deposed. On April 21, 1978, the employee was permitted to file an amended answer. Subsequently, the employer moved for summary judgment. The employee filed an affidavit in opposition to summary judgment. The employer contended the district court should not consider the affidavit as it was inconsistent with the employee's February deposition. The trial court agreed and granted summary judgment for the employer. On appeal the Fifth Circuit Court of Appeals reversed, holding the lower court erred when it declined to consider the employee's affidavit. The Fifth Circuit reviewed the deposition and found plaintiff's counsel's questioning confusing and the deposition, as a result of the confusing questions, was inconsistent even without reference to the affidavit. The federal appellate court found the employee's postamended answer affidavit was submitted to clarify his deposition responses in light of plaintiff's confusing questions. The Fifth Circuit Court of Appeals stated:

"In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition. *See, e.g., Camerlin v. New York Central R. Co.,* 199 F.2d 698, 701 (1st Cir. 1952); *Adams v. United States,*

392 F. Supp. 1272, 1274 (E.D. Wis. 1975). 'An opposing party's affidavit should be considered although it differs from or varies his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.' 6 *Moore's Federal Practice* ¶ 56-15[4], p. 56-522 (2d Ed.) (footnote omitted). *See generally Guarantee Insurance Agency Co. v. Mid-Continental Realty Corp.*, 57 F.R.D. 555, 563 [(N.D. Ill. 1972)]. Thus, a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition." 622 F.2d at 893.

Continuing:

"The gravamen of the *Perma Research-Radobenko* line of cases is the reviewing court's determination that the issue raised by the contradictory affidavit constituted a sham." 622 F.2d at 894.

Noting:

"In light of the fact that the affidavit is generally consistent with the position forwarded in the deposition, *the concerns raised in Perma Research and Radobenko are not present in this case.*" 622 F.2d at 895. (Emphasis supplied.)

Each of the court cases discussed herein (*Radobenko, Perma Research, Powell,* and *Kennett-Murray*) concerns an affidavit of a party which is challenged on the basis of inconsistency with the party's prior deposition as considered in conjunction with a summary judgment motion against that party. Doc Dale technically does not come within that category. However, Doc Dale, d/b/a Doc's Backhoe and Roustabout Service, and its workers' compensation carrier, Cimarron Insurance Company, Inc., were voluntary parties as intervenors and were allied in interest with the plaintiff. They had a financial interest in any recovery by plaintiff against the defendants and were in the action as intervenors to protect their subrogated interest as authorized by K.S.A. 44-504. Under such circumstances, we see no legitimate reason why the *Radobenko, Perma Research* and *Powell* rationale should not apply with equal force to the affidavits of Doc Dale.

The questions and answers in the depositions pertinent to the issue herein are clear and free from any confusion of meaning. Over three years elapsed between their taking and the filing of the affidavits herein. The affidavits are unquestionably in direct response to the filing of the summary judgment motions. In fact, the affidavits attached to the response to the Ciba-Geigy motion (plaintiff's affidavit and one of Dale's affidavits) were not even filed until subsequent to the granting of summary judgment to Misco on October 1, 1981, and were also utilized by plaintiff in a

motion to reconsider said summary judgment. The summary judgment motions illuminated major flaws in plaintiff's case and the affidavits were obviously intended to contradict the prior depositions and thereby defeat the entry of summary judgment.

We conclude the district court did not err in striking the three disputed affidavits so far as they were inconsistent with, or contrary to, the respective affiant's prior deposition testimony.

## AMENDMENT OF UNCONTROVERTED FACTS

The second issue is alleged error in permitting defendant Ciba-Geigy orally to add, at the summary judgment hearing, a 56th "uncontroverted" factual statement to its previously filed 55 "uncontroverted" facts.

On July 24, 1981, plaintiff took the deposition of Ciba-Geigy's marketing manager, Louis C. DiSioudi. On September 25, 1981, plaintiff took the deposition of a Ciba-Geigy's expert engineering witness, Dr. Charles R. Manning.

The Ciba-Geigy motion for summary judgment was heard on October 22-23, 1981, wherein counsel for said defendant, Ciba-Geigy stated:

"Those are the uncontroverted facts which, from Ciba-Geigy's standpoint, should be found in this case, with one additional uncontroverted fact we would like to suggest, based upon expert testimony in this case.

"And I'm sorry I don't have this typed out. I would be happy to do that and furnish it to the Court. It would read, as follows: with references, the only expert testimony as to the initial cause of the failure which allowed gas and/or oil to escape causing the explosion was expressed by two experts for defendant Ciba-Geigy, Louis C. DiSioudi, and Dr. Charles R. Manning.

"Mr. DiSioudi of Ciba-Geigy testified that the steel low pressure nipple, which is not a Ciba-Geigy product, failed as a result of a slug of fluid hitting the separator end of the pipe at the elbow, and that almost simultaneously this caused the connection somewhere in the area of the steel and fiberglass connection to fail; reference DiSioudi deposition, page 180 on line 16 through page 181, line 20.

"Dr. Charles Manning, who has a doctorate degree in materials engineering and is a professor of materials engineering at New York State University; Manning Deposition, page 4, line 9 through page 6, line 21.

"Dr. Manning testified, based upon his calculations and tests, that the low pressure nipple failed first, and that this then caused a failure at the steel to fiberglass connection, or a failure at the two couple interfaces, the Victaulic coupling; deposition of Manning, page 52, line 12, through 54, line 5. .

"The low pressure nipple should have been a high pressure nipple; deposition of Dale, page 31, line 17, through page 34, line 6.

"The steel low pressure nipple was not manufactured by Ciba-Geigy Corporation, nor sold by Ciba or the defendant Misco. The grooved steel nipple, which

is the part beyond the Victaulic coupling—added, parenthetically, the grooved steel nipple and the Victaulic coupling were not manufactured or sold by the defendant Ciba-Geigy—that reference on that is deposition of DiSioudi, page 168, line 17 through page 169, line 14.

"Your Honor, with respect to the plaintiff's response, they have in their response a number of additional uncontroverted facts. I would either be happy to go through my comments on those, at this time, or wait until they explain those additional uncontroverted facts that they feel are necessary, and then make any comments at that time."

Plaintiff objected to this additional factual statement and contends on appeal it is violative of Supreme Court Rule 141, (230 Kan. lxxxv).

Supreme Court Rule 141 provides in relevant part:

"No motion for summary judgment shall be heard or deemed finally submitted for decision until:

"(a) The moving party has filed with the court and served on opposing counsel a memorandum or brief setting forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant (with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the record)."

Plaintiff contends the record shows the district court relied on this improper factual statement in entering summary judgment and cites the following comments by Judge Calvert at the October 23, 1981, hearing:

"I have prepared roughly, or perhaps specifically, uncontroverted facts taken from the statement of uncontroverted facts by both parties. I have also considered that there are some uncontroverted facts as set forth in the oral argument of the parties which was taken from the depositions.

"Taken in its best light, the Court must make a determination of what the evidence of the plaintiff is about where the failure was. *The only evidence that I have heard that anybody came up with about where it probably was was the low pressure nipple that was located about twenty feet from any product manufactured by [Ciba-Geigy].* There were other failures.

"There was, after that failure, a chain reaction of some type. I'm not sure anybody understands exactly what happened. The only person that I ever heard that stated their opinion as to what it probably was was Mr. DiSioudi, that said the pipe came up out of the ground and then it separated. The testimony from the witness is that it separated five feet either side of the joint.

"The initial failure was probably, by every construction of the testimony, at a place not manufactured by Ciba-Geigy.

"Ciba's duty to warn does not extend to a product not manufactured by them." (Emphasis supplied.)

The formal findings prepared by the district court make no

specific findings as to precisely where the failure occurred. It is difficult to find any reliance by the trial court on the complained-of statement.

In any event, the additional factual statement did not contain any material new to the plaintiff. His counsel had taken the DiSioudi and Manning depositions which were the sources for virtually all the additional factual statement. The Dale deposition was also well known to plaintiff as his counsel had participated therein. There is no claim of inaccuracy which went undetected by virtue of the late introduction of the statement. Even assuming the district court did rely in part on the additional statement, we see no prejudice to the plaintiff. The allowance of the additional statement was within the discretion of the district court and we find no abuse of that discretion.

## MATERIAL FACTS IN DISPUTE

For his third issue on appeal plaintiff contends the district court ignored material fact issues in entering summary judgment for the defendants. The trial court made extensive findings of uncontroverted facts, relative to the Ciba-Geigy summary judgment, wherein some 55 findings of uncontroverted facts are set forth. Plaintiff finds fault with virtually every unfavorable finding in both judgments. Many of the complaints are predicated on material contained in the stricken affidavits already discussed. Nothing would be gained in this opinion by setting forth each of the numerous complaints and discussing them individually. It is sufficient to say that each specific point has been individually considered and no error of any substance has been found.

Further plaintiff complains about numerous findings of fact which he proposed, but which were not adopted by the trial court. Each point of this aspect of the issue has also been afforded careful consideration and no error has been shown. We conclude that issue three in its totality is without merit.

## MANUFACTURING DEFECT

The fourth issue is whether the district court erred in holding defendant Ciba-Geigy was entitled to summary judgment on plaintiff's theory of strict liability in tort based on manufacturing defect.

At the onset it should be noted that there is no direct evidence of a specific defect in any product manufactured by Ciba-Geigy which was a component of the gas line system herein. This

brings us to the theory of nonspecific manufacturing defect asserted by the plaintiff. Simply put, may a manufacturing defect be proved by circumstantial evidence? In *Southern Co. v. Graham Drive-In*, 271 Ark. 223, 607 S.W.2d 677 (1980), plaintiff brought an action to recover on a lien on a gas storage tank it had sold to defendant. Defendant cross-claimed contending the tank was defective as it had leaked gasoline into nearby water supplies. Defendant was unable to establish a specific defect but proceeded on a nonspecific theory. Quoting from authority, the Arkansas Supreme Court commented:

"The doctrine of strict liability does not change the burden of proof as to the existence of a flaw or defect in a product. However, it does away with the necessity of proving negligence in order to recover for injuries resulting from a defective product. *Higgins v. General Motors Corp.*, 250 Ark. 551, 465 S.W.2d 898 (1975); and *Cockman v. Welder's Supply Co.*, 265 Ark. 612, 580 S.W.2d 455 (1979). Prosser, The Fall of the Citadel, 32 ATL L.J., p. 21 (1968), has discussed the elements of proof:

" 'Strict liability eliminates both privity and negligence; but it still does not prove the plaintiff's case. He still has the burden of establishing that the particular defendant has sold a product which he should not have sold, and that it caused his injury. This means that he must prove, first of all, not only that he has been injured, but that he has been injured by the product. The mere possibility that this may have occurred is not enough, and there must be evidence from which the jury may reasonably conclude that it is more probable than not . . . . The plaintiff must prove also that he was injured because the product was defective, or otherwise unsafe for his use . . . .'

"Further [in] Prosser Torts, § [103], p. 672 (4th Ed. 1971), it is stated that such proof may be by circumstantial evidence:

" 'The difficult problems are those of proof by circumstantial evidence. Strictly speaking, since proof of negligence is not in issue, res ipsa loquitur has no application to strict liability; but the inferences which are the core of the doctrine remain, and are not less applicable. The plaintiff is not required to eliminate all other possibilities, and so prove his case beyond a reasonable doubt. As on other issues in civil actions, it is enough that he makes out a preponderance of probability. It is enough that the court cannot say that reasonable men on the jury could not find it more likely than not that the fact is true.'

"See also, Woods, Comparative Fault, §§ 14:18 and 14:19 (1978); and Restatement, Torts 2d § 402A (1965).

"It is true, as appellant argues, that liability cannot be based on mere conjecture and guess. *Delta Oxygen Co. v. Scott*, 238 Ark. 534, 383 S.W.2d 885 (1964). However, in the absence of direct proof of a specific defect, it is sufficient if a plaintiff negates other possible causes of failure of the product, not attributable to the defendant, and thus raises a reasonable inference that the defendant as argued here, is responsible for the defect. *Higgins v. General Motors Corp.*, [250 Ark. 551,] and *Cockman v. Welder's Supply Co.*, [265 Ark. 612]. See also *Jakubowski v. Minnesota Mining and Manufacturing*, 42 N.J. 177, 199 A.2d 826

(1964); *Greco v. Bucciconi Engineering Co.*, 407 F.2d 87 (3rd Cir. 1969); *Corbin v. Camden Coca-Cola Bottling Co.*, 290 A.2d 441, 60 N.J. 425 (1972); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir. 1972).

"The burden of proof was upon appellees to show that the circumstances surrounding the transaction were such as to justify a reasonable inference of probability rather than a mere possibility that appellant is responsible." 271 Ark. at 225-26.

In *Stewart v. Ford Motor Co.*, 553 F.2d 130 (D.C. Cir. 1977), deceased had bought a new automobile and a few days later, after driving 1,400 miles, the vehicle veered off a highway, headed straight for a bridge, and into a river. Plaintiff lacked direct evidence of a product defect but by a process of elimination was able to establish the cause of the accident originated in something produced by defendant.

"[C]ircumstantial evidence is admissible to prove the existence of a defect. *See McCrossin v. Hicks Chevrolet, Inc.*, [248 A.2d 917 (D.C. 1969).]

"In holding that the existence of a defect may be proved by circumstantial evidence, however, courts in other jurisdictions have indicated that the burden remains on the plaintiff to present evidence on two closely related points. First, plaintiff must present evidence which would tend to negate causes for an accident other than a defect in the product. *See Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 640 (8th Cir.), *on remand*, 352 F. Supp. 633.(E.D. Mo. 1972), *aff'd*, 485 F.2d 1288 (8th Cir. 1973); *Franks v. National Dairy Products Corp.*, 414 F.2d 682, 684 (5th Cir. 1969); *Bollmeier v. Ford Motor Co.*, 130 Ill. App. 2d 844, 265 N.E.2d 212, 217 (1970). Second, plaintiff must present proof which would suggest that whatever defect might have existed was one introduced into the product by the defendant. *See, e.g. Lindsay v. McDonnell Douglas Aircraft Corp.*, *supra*, 460 F.2d at 637; *Greco v. Bucciconi Engineering Co.*, 407 F.2d 87, 91 (3d Cir. 1969); *Elmore v. American Motors Corp.*, 70 Cal. 2d 578, 75 Cal. Rptr. 652, 451 P.2d 84, 87 (1969) *(en banc)*; *Shramek v. General Motors Corp.*, 69 Ill. App. 2d 72, 216 N.E.2d 244, 247-249 (1966);. *Wojciuk v. United States Rubber Co.*, 19 Wis. 2d 224, 120 N.W.2d 47, 52 (1963).

"The quantum of proof that must be adduced to meet these two specific requirements is not great." 553 F.2d at 137.

Continuing:

"[T]he burden on the plaintiff is only to negate those causes not in the control of the defendant which might reasonably have led to the accident. In identifying the causes plaintiff must negate, courts have usually required proof rebutting only the most obvious causes." 553 F.2d at 138. (Emphasis supplied.)

See also *Wolff v. Whittaker Marine & Mgf. Co., Inc.*, 484 F. Supp. 1021 (E.D. Mo. 1979).

*Mateika v. La Salle Thermogas Co.*, 94 Ill. App. 3d 506, 418 N.E.2d 503 (1981), was a case involving a propane tank which

exploded and burned a workman. Plaintiff brought suit but had no direct evidence of product defect. Summary judgment was entered in favor of the defendant manufacturer. The Illinois Court of Appeals affirmed, stating:

"For the plaintiff to present a prima facie strict liability case, he must produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) These elements may be proven inferentially, by either direct or circumstantial evidence. (*Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449.) For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. (*Mullen v. General Motors Corp.* (1975), 32 Ill. App. 3d 122, 336 N.E.2d 338.) Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility.

"While a plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim. (*Vuletich v. Alivotvodic* (1979), 73 Ill. App. 3d 927, 392 N.E.2d 663.)" 94 Ill. App. 3d at 508.

The closest case in Kansas to this issue is *Farmers Ins. Co. v. Smith*, 219 Kan. 680, 549 P.2d 1026 (1976), a case where, coincidentally, Judge Calvert also served as trial judge. Farmers' insured purchased a new mobile home. The insureds had difficulties with the home including electrical problems. Three months after purchase and while the insureds were absent, the home burned. Numerous causes of the fire were propounded including an electrical heating tape, hot water service, power surges and a drop cord. The trial court directed verdicts for the defendants. Plaintiff produced an expert on mobile home fires who, by a process of elimination, ultimately concluded the source of the fire was a loose connection at or near the circuit breaker box in the mobile home. In holding the trial court erred in precluding the expert from giving his ultimate opinion as to the cause of the fire, we said:

"Sevart [the expert] stated that he looked for all of the possibilities that could start a fire and then by the process of elimination, he went through the complete checklist of possibilities to arrive at his opinion as to the source of ignition and the source of combustion in this fire.

". . . Severt testified that in his opinion the cause of the fire was a loose connection at or near the electrical circuit breaker box. The trial court then inquired as to how Sevart came to that conclusion. The substance of Sevart's

testimony was as follows: This was a nearly new electrical home which had been occupied for only a short period of time. There was nothing to indicate that the wiring into the home and the wiring remaining in the home and the construction of the home were not in compliance with the code. The purpose of the circuit breaker box is to protect against overloads and not to protect against loose circuits and, in fact, there is no standardized test to check for loose circuits. Loose circuits cause trouble by degree. If the circuit is very loose, like the wire is disconnected, there is no problem because there is no current flow. But if the circuit is merely loose because it leaves the factory this way or vibrates loose over the 300 mile trip from the factory and it happens to be a relatively high current carrying circuit then there will be heat generated at that location, and this has been a cause of fires and he has personally investigated a fire of this type. Sevart arrived at his conclusion partly because he did not find any other things wrong. . . . Based upon the knowledge he gained as a result of his investigation of the fire, reading the depositions taken, and being present at the trial, it was Sevart's opinion that a loose connection, rather than a short circuit, at or near the breaker box was the cause of the fire. Based upon his investigation he determined that the hot spot of the fire was in the area of the circuit breaker box. He was not of the opinion, however, that the breaker box itself was substandard or that any other thing was wrong with it.

. . . .

"[T]he trial court was in error in excluding from evidence Sevart's opinion as to the source of the electrical fire. *It is, of course, settled law in this state that a cause of action may be proved by circumstantial evidence, and such evidence, in order to be sufficient to sustain a verdict of a jury, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion.* . . . It is quite proper to use expert testimony to prove the cause of a fire provided the opinion of the expert is based upon adequate facts and is not based upon evidence which is too uncertain or speculative. (*Virginia Surety Co. v. Schlegel,* 200 Kan. 64, 434 P.2d 772 [1967]; *American Family Mutual Ins. Co. v. Grim,* 201 Kan. 340, 440 P.2d 621 [1968].)" 219 Kan. at 686-89. (Emphasis supplied.)

## Concluding:

"By his elimination of other possible causes for the fire it would appear that his conclusion was reasonable that the fire was the result of some defect in the mobile home's electrical system." 219 Kan. at 690.

The action in *Farmers Ins.* was predicated on breach of express or implied warranty. The direction of the verdicts was affirmed on the basis plaintiff had no evidence such loose connection, even if it were the cause of the fire, existed at the time it left the manufacturer's possession. The excluded expert testimony did not go to this issue. We see no reason, however, why the rationale of *Farmers Ins.* as far as proving manufacturing defects by circumstantial evidence should not apply equally to a products liability action.

We believe the test cited herein from *Mateika v. La Salle Thermogas Co.*, 94 Ill. App. 3d 506, is an appropriate statement of the applicable law and we adopt the same. We therefore conclude the plaintiff, to present a prima facie strict liability case, must produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control. These elements may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility. While a plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim.

The findings of the district court established blatant and massive misuse of the products as components of the system installed and tested by Doc Dale. Further, the district court held:

"Generally, the court finds that the plaintiff is unable to negate products by manufacturers other than Ciba-Geigy as being products where a failure occurred. Although there is a possibility that a Ciba-Geigy product failed, there is an equal possibility that a non-Ciba-Geigy product failed."

We conclude the district court did not err in entering summary judgment for defendant Ciba-Geigy on plaintiff's theory of strict liability in tort based on manufacturing defect.

## DUTY TO WARN

The fifth issue is whether the district court erred in holding defendants were entitled to summary judgment on the claims of liability for failure to warn under theories of strict liability and negligence.

Plaintiff seeks to predicate liability on the failure to warn as to both Doc Dale and his employee, plaintiff herein. By virtue of their differing status, we shall consider them separately.

We shall first consider the issue as it relates to Doc Dale.

Doc Dale worked as a roustabout for Mull Drilling Co. prior to becoming the firm's Production Superintendent in about 1964. He continued such employment until starting his own business

in March 1974, which business operated under the name Doc's Backhoe and Roustabout Service. Doc Dale described his business as "setting pumping units, hooking up wells, setting tank batteries, separators and what have you." The separator on the lease in question had been put in place by Doc Dale at some date prior to the accident herein for use in conjunction with the other two wells. Dale had attended a Ciba-Geigy C-300 fiberglass installation demonstration conducted on a Mull Drilling job site in the early 1960's.

Ciba-Geigy prepared and sent to Misco an instruction manual on the installation of C-512 fiberglass pipe. No claim is made the 42-page illustrated material is in anyway inadequate or incomplete. The manual covers, step by step, the proper installation and testing of a pipeline system based on the usage of Ciba-Geigy products including fiberglass-to-steel connections. The manual was intended for the usage of Ciba-Geigy fiberglass pipe purchasers and installers. Copies of the manual were placed on the Misco sales counter and were available to Dale and other customers. Dale did not have a copy of the manual and did not read the manual.

The Misco employee with whom Doc Dale primarily transacted business was Paul Lipscomb. Mr. Lipscomb believed Dale was a good installer and his work had always been given highest recommendations for quality. Lipscomb personally knew Dale had installed at least 20,000 feet of fiberglass pipe and had no knowledge of any problems Dale might have previously encountered in the installation of fiberglass pipe. Dale, apparently, had never had an accident installing such pipe. On the day of installation of the pipe on the lease in question, Kostner No. 3, Dale went to the Misco store to purchase the materials he had determined were needed for the job. Dale characterized his method of purchasing from Misco as follows:

"Q. When you go to—like in this case when you went to get this material do you till Lipscomb—how do you and Paul Lipscomb go about getting this material together? In other words, do you go down and itemize each item that you need or how does that work?

"A. No sir. Usually I don't even write it down. I have done enough of that that I go in there and I say, 'Paul, I need this and that and—' —I'll start telling him and they start getting it.

"Q. You just start rattling it off to him?

"A. Right."

Illustrative of Dale's confidence in and reliance on his own expertise in hooking up wells are the following excerpts from his deposition:

"Q. I'm going to hand you what's been marked as Deposition Exhibit 20 which I understand are instructions that were packed with the kit [Ciba-Geigy epoxy kit] that Mr. Withers has provided to us. Do you recall seeing instructions like those in the kit that you got to make this hook-up on this particular well, whether you did or not?

"A. I can't say as I did.

"Q. If you had had instructions in that kit would you have read them?

"A. No, sir.

"Q. Did you need instructions to know how to make the connection?

"A. I felt like I didn't.

. . . .

"Q. Do you know whether or not the connecter kit for making the steel to Ciba connections which was purchased and used on this particular job had any written instructions with it?

"A. You mean the Ciba kit?

"Q. Right

"A. I can't say whether it did or didn't, because I have used so many of them I don't pay any attention to whether it had instructions in it or not."

. . . .

"Q. Insofar as directions for use and that type of thing, you didn't really need anybody from Misco as of December 18, 1976, to give you any directions on how to install that Ciba pipe, did you?

"A. No, sir.

"Q. You had done it before and—

"A. Right.

. . . .

"Q. And you consider yourself to be an experienced man and indeed an expert on the job of doing what you were doing out there on this Kostner #3, don't you?

"A. I figured I knew what I was doing, yes.

"Q. And the people at Misco-United Supply understood you to be an experienced man and an expert in the field when they sold you this material, didn't they?

"A. Yes.

. . . .

"Q. Didn't the people at Misco treat you as a man who knew his business as you think you do?

"A. Yes, right."

Under the circumstances herein did defendant Ciba-Geigy and Misco breach a duty to warn Dale of the danger resulting from improper installation and testing procedures of the pipeline system? We believe not.

In *Younger v. Dow Corning Corporation*, 202 Kan. 674, 451

P.2d 177 (1969), the Court reiterated Restatement (Second) of Torts § 388 (1965), comment *c*.

"[I]t is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe." 202 Kan. at 678.

In *Russell v. G.A.F. Corp.*, 422 A.2d 989 (D.C. 1980), plaintiff was injured when a sheet of corrugated asbestos cement shattered while it was being installed. There was no evidence the product was inherently defective, either by design or manufacture; however, there was information the product could be dangerous if not properly used. The *Russell* court stated the general proposition of law:

"A product can be perfectly made and still require directions or warnings on proper use in order to be safe. *See Biller v. Allis Chalmers Manufacturing Co.*, 34 Ill. App. 2d 47, 180 N.E.2d 46 (1962)." 422 A.2d at 991.

The court in *Russell* noted:

"A plaintiff may limit the claim to negligence in failing to warn about foreseeable harm from a product, *see Burch v. Amsterdam Corporation*, D.C. App., 366 A.2d 1079, 1086 (1976), or claim strict liability for injury derived from the same failure. *See* Restatement (Second) of Torts § 402A, Comment j (1965). In either case, however, the duty is the same: ordinary care. *See Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426 (2d Cir. 1969) (Restatement, *supra* § 402A, Comment k, adopting the ordinary negligence standard of duty to warn)." 422 A.2d at 991.

In *Harris v. Northwest Natural Gas Company*, 284 Or. 571, 588 P.2d 18 (1978), plaintiff brought suit against a gas company when pilot lights on a hot water service or furnace exploded gasoline vapors which built up in a garage. The *Harris* court, relying upon Restatement (Second) of Torts § 402A (1965), commented:

"It is not essential that the product be defective in the sense that it was not properly manufactured. A product may be perfectly manufactured and meet every requirement for its designed utility and still be rendered unreasonably dangerous through failure to warn of its dangerous characteristics. *Jackson v. Coast Paint and Lacquer Company*, 499 F2d 809, 811 (9th Cir 1974), citing *Davis v. Wyeth Laboratories, Inc.*, 399 F2d 121 (9th Cir 1968). It is considered defective when it is sold without a warning. Comment *h*, § 402A." 284 Or. at 576-77, n. 8.

In *Eyster v. Borg-Warner*, 131 Ga. App. 702, 206 S.E.2d 668 (1974), an electrician installing a heating and air conditioning

unit attached house aluminum wires to copper wires in the unit. The electrician knew aluminum-copper connections could cause fires. A fire occurred. Suit was filed against Borg-Warner, the manufacturer, for failure to warn of the hazards associated with aluminum to copper connections. The trial court granted Borg-Warner a directed verdict and the Georgia Court of Appeals affirmed, stating:

"As the specific danger of the aluminum-copper connection was one commonly known to those in the trade, there was no duty on the manufacturer to warn of this hazard. There is no 'duty on the manufacturer or seller to warn of obvious common dangers connected with the use of a product.' *Poppell v. Waters*, 126 Ga. App. 385, 388 (190 SE2d 815) [1972]. '*Where the product is vended to a particular group or profession, the manufacturer is not required to warn against risks generally known to such group or profession.*' Frumer & Friedman, Products Liability, Vol. 1, § 8.04, p. 181, n. 3. See also Parker v. State, 201 Misc. 416, 105 N.Y.S.2d 735 [1951], aff'd 112 N.Y.S.2d 695 [1952]." 131 Ga. App. at 704. (Emphasis supplied.)

In *Littlehale v. E. I. du Pont de Nemours & Co.*, 268 F. Supp. 791 (S.D. N.Y. 1966), *aff'd* 380 F.2d 274 (2d Cir. 1967), defendant had manufactured blasting caps for the U.S. Government during World War II. In 1957, plaintiffs, a Navy seaman and a civilian employee, were conducting propagation tests for the Navy's Underwater Sound Laboratories in New London, Connecticut when one of the caps exploded prematurely. Plaintiffs alleged du Pont had failed to warn of certain inherent dangers in the use of blasting caps. In entering judgment for du Pont the federal district court observed:

"[T]here is ordinarily no duty to give warning to members of a profession against generally known risks. 'There need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession.' 4 Shearman & Redfield, Negligence § 656 (Rev. ed. 1941); see Rosebrock v. General Elec. Co., 236 N.Y. 227, 237-238, 240-241, 140 N.E. 571, 574, 575 (1923); McDaniel v. Williams, 23 App. Div. 2d 729, 257 N.Y.S.2d 702 (1st Dep't 1965); Parker v. State, 201 Misc. 416, 105 N.Y.S.2d 735, 741 (Ct. Cl. 1951), aff'd, 280 App. Div. 157, 112 N.Y.S.2d 695 (3d Dep't 1952); cf., Marker v. Universal Oil Prod. Co., 250 F.2d 603 (10th Cir. 1957); Kapp v. E. I. Du Pont De Nemours & Co., 57 F. Supp. 32 (E.D. Mich. 1944); Morrocco v. Northwest Eng'r Co., 310 F.2d 809, 810 (6th Cir. 1962); Jamieson v. Woodward & Lothrop, 247 F.2d 23 (D.C. Cir.), cert. denied, 355 U.S. 855, 78 S.Ct. 84, 2 L.Ed.[2d] 63 (1957); Sawyer v. Pine Oil Sales Co., 155 F.2d 855 (5th Cir. 1946); Stottlemire v. Coward, 213 F. Supp. 897 (D.D.C. 1963).

"If no warning is required to be given by the manufacturer to a purchaser who is well aware of the inherent dangers of the product, there is no duty on the part

of the manufacturer to warn an employee of that purchaser. Marker v. Universal Oil Prod. Co., 250 F.2d 603 (10th Cir. 1957)." 268 F. Supp. at 798-99.

The above cases refer generally to dangers associated with the use of a particular product. As previously noted in this opinion, we are not dealing with a particular product manufactured by Ciba-Geigy that is specifically claimed to be defective or have caused the injury. Some Ciba-Geigy products were used as the component parts of the pipeline system along with products manufactured by others. Under the circumstances herein, any failure to warn must be predicated on breach of some duty to instruct on proper procedures of testing the completed system.

Dale was in the business of hooking up oil and gas wells. The numerous errors he made in testing the system he installed on this job go to his basic competence to perform his trade. By analogy, is a manufacturer or supplier of plumbing materials required to instruct every professional plumbing contractor to whom its plumbing products may be sold on basic plumbing procedures? We believe not. The installation of a gas pipeline system is obviously a highly specialized industrial field of en-deavor—not the weekend activity of a neophyte do-it-yourselfer. Inherent in any installation of a system to transport natural gas under pressure from one place to another is the risk of fire and explosion. Under the circumstances herein it would be wholly unrealistic to hold that Misco's employee, Mr. Lipscomb, had a duty to refuse to sell Dale the pipeline component parts in question until he explained to him the fundamentals of pipeline installation and testing procedures, or had required Dale to read the 42-page Ciba-Geigy installation manual.

In *Thibodaux v. McWane Cast Iron Pipe Co.*, 381 F.2d 491 (5th Cir. 1967), a manufacturer sold cast iron gas pipe to a Louisiana town. Town officials knew the local soil was corrosive upon metal in the ground. Twenty-one years after the pipes had been laid a residential gas explosion occurred. The explosion's cause was determined to be a hole in the pipe due to the caustic nature of the soil. Plaintiff homeowner brought an action con-tending defendant-manufacturer had breached its duty to warn in not telling the town officials about what effect soil may have on metal pipes. The federal district court granted defendant a directed verdict and the Fifth Circuit Court of Appeals affirmed. After noting a nondefective cast iron pipe was not, in and of itself, a dangerous substance nor that there was any danger

inherent in such pipe, the court observed town officials already knew of the corrosive effect of the soil.

"[T]he duty to warn does not exist where the other party is already aware of the danger. Singleton v. Olin Mathieson Chemical Corp., 131 So. 2d 329 (La. App. 1961); Bragg v. Boh Bros. Const. Co., et al., 147 So.2d 258 (La. App. 4 Cir. 1962); Knott v. Williams, 109 So. 2d 517 (La. App. 1959); Sawyer v. Pine Oil Sales Co. et al., 155 F.2d 855 (5 Cir. 1946)." 381 F.2d at 495.

### Continuing:

"We find that the consulting engineers were familiar with or chargeable with knowledge of the corrosion characteristics of McWane pipe and that such facts were properly within the scope of their own responsibility and expertise. We therefore conclude that McWane was under no obligation to inform them of such, or to give the warning as contended by the appellant." 381 F.2d at 495.

### Concluding:

"Finally and most importantly, the consulting engineers, hired by the City to design, supervise and control the construction of the gas distribution system were or should have been as knowledgeable of the characteristics of cast iron pipe as was McWane, perhaps more so. In these circumstances, we conclude that McWane did not breach any duty owed to the City and its consulting engineers and therefore we find that McWane was not negligent." 381 F.2d at 497.

K.S.A. 1982 Supp. 60-3305, although enacted after the incident herein, states the generally applicable rules of law as follows:

"In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend: (a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances;

"(b) to situations where the safeguards, precautions and actions would or should have been taken by a reasonable user or consumer of the product similarly situated exercising reasonable care, caution and procedure; or

"(c) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product."

We conclude the district court did not err in entering summary judgments for defendants Misco and Ciba-Geigy on the issue of failure to warn Dale.

We turn now to the failure to warn issue as it relates to plaintiff himself.

Plaintiff was working as a roustabout for Dale at the time of the explosion. He had only a few weeks experience working in such capacity. He was working under the direct supervision of Dale. Dale was in charge of the installation. In Dale's deposition the issue of control of the installation was explored, specifically as to the role of the Graves' employee Bob Miller. The following questions and answers were made:

"Q. *You're the boss?*
"A. Right.
"Q. *And you determine how it's going to be hooked up and what's going to be done?*
"A. And Bob and I have discussed that before, who was going to be boss.
"Q. And who is it, you?
"A. And *I'm the boss when I'm hooking her up, yes sir.*
"Q. *It's your baby to do it your way?*
"A. *Yes, sir, right.*" (Emphasis supplied.)

Dale was in charge of the installation and testing of the system and he wholly controlled what was done that day. Were Misco and/or Ciba-Geigy under some duty to instruct plaintiff in basic gas pipeline laying and system testing? We believe not. To hold otherwise would place an impossible burden on manufacturers and sellers of industrial products.

As previously noted, the hooking up of a natural gas well is a highly specialized industrial activity. The danger of explosion and fire during such activities is common knowledge. The determination of the testing procedures to be utilized is under the control of the person in charge of the installation. This may be distinguished from the operation of a machine commonly used by low echelon personnel or laborers where a simple warning on the machine may be necessary to advise or remind its users of a particular danger in the use of the machine. Misco and Ciba-Geigy are not under a duty to provide each employee of the installer of their products with the manual on proper installation and testing procedures or otherwise train such employees.

We conclude the trial court did not err in entering summary judgment in favor of Misco and Ciba-Geigy on the issue of failure to warn plaintiff.

## EXPRESS WARRANTY

The sixth issue on appeal is whether the district court erred in granting summary judgment to defendants on plaintiff's claim of breach of express warranties.

Plaintiff contends express warranties were created by Ciba-Geigy and Misco under K.S.A. 84-2-313(1)(*a*) and (*c*), reproduced as follows:

"Express warranties by the seller are created as follows:

"(*a*) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

. . . .

"(*c*) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."

Specifically, plaintiff contends the fiberglass pipe failed to withstand its rated 1400 p.s.i. testing pressure which was expressly warranted pursuant to (*a*) section above. Further, plaintiff contends improper installation procedures shown Doc Dale in the early 1960's by defendants constituted a breach of express warranty under section (*c*) of the statute.

We shall first discuss the point relative to failure of the fiberglass pipe. The pipe was a component part of the pipeline system installed by Dale to connect the oil and gas well to the separator and tank battery. The failure of the system was due to improper installation, improper testing procedures, or one or more defective component parts. Plaintiff simply did not produce evidence tending to show the cause of the system's failure was inability of the fiberglass pipe to withstand pressure up to its warranty capacity of 1400 p.s.i. Additionally, there are the previously referred to findings of grossly improper testing procedures of the system which clearly constituted product misuse.

We turn now to the point of alleged breach of express warranty stemming from the training session. The training session occurred at least ten years prior to the 1976 explosion herein and involved procedures for installing a *low-pressure* C-300 Ciba-Geigy fiberglass pipe. The pipe herein was a much newer product, a C-512 *high-pressure* pipe. In the intervening years Doc Dale had extensive experience in installing all types of oil and gas line pipe. Under the circumstances herein, it simply cannot be said Doc Dale purchased the C-512 pipe in reliance on anything said or done in the old C-300 training session or that same was a "basis for the bargain." To do so would mean the 1960's training session was some type of express warranty at-

taching to the use and purchase of all subsequent Ciba-Geigy pipeline products—a wholly unsupportable position.

In disposing of the express warranty claim the district court stated:

"As to the express warranty; express warranty, I think the evidence just fails, period, in that regard. It wasn't part of the bargain, it wasn't an on-going thing; it was just way too remote in time, among other things."

We conclude the district court did not err in granting summary judgment to defendant on the issue of breach of express warranties.

## WORKERS' COMPENSATION

The final issue concerns the propriety of the summary judgment entered in favor of defendant Graves Drilling Company, Inc., on the basis that said defendant was the statutory employer of plaintiff pursuant to K.S.A. 44-503(*a*). Said statute provides in pertinent part:

"Where any person (in this section referred to as principal) *undertakes to execute any work which is a part of his trade or business or which he has contracted to perform* and contracts with any other person (in this section referred to as the contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any workman employed in the execution of the work any compensation under the workmen's compensation act which he would have been liable to pay if that workman had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then in the application of the workmen's compensation act, references to the principal shall be substituted for references to the employer." (Emphasis supplied.)

The facts relative to the nature of Graves' business and its relationship to the type of work activity giving rise to the injury herein must be set forth in detail.

Graves Drilling Company, Inc., is a corporation engaged in the business of leasing, developing, operating and producing oil and gas properties. There were two producing gas wells on the Kostner lease property along with a separator and a tank battery. Graves was the operator-producer of this particular lease, but had no ownership interest in it. Graves operated the lease for the owners under an oral agreement. There was no production on the lease prior to the time Graves became the operator thereof. Under the operating agreement Graves was paid a monthly overhead and supervising charge. Graves hired an independent pumper for the lease who was paid by Graves, but the cost

thereof was passed on to the owner. Graves supervised the operation, made minor repairs, and arranged for major repairs to be done.

Sometime prior to the December 18, 1976, accident the owners of the lease decided a third gas well should be drilled. Included in the duties of operator/producer Graves was the responsibility of transforming this decision into the creation of the third producing well. Graves as operator/producer of the lease hired Graves as drilling contractor to drill the well. The cost of same was passed on to the owners on a set charge per foot of drilling basis. After the well had been drilled Graves hired an outside firm to complete the well. After completion of the well, all that remained to be done was to hook up said well to the existing separator and tank battery some 1,200 feet away. This involved digging a suitable ditch and installing a pipeline between the well and the separator.

Graves performed the hookup procedure on about 30 percent of the wells it drilled, but elected to hire an outside firm, Doc's Backhoe and Roustabout Service, to hook up the well in question. Plaintiff was an employee of Doc's company. Graves did not own digging equipment and, when hooking up wells itself, would hire someone with trenching equipment to dig the necessary ditches. Graves may or may not have had enough roustabouts on the payroll on the day in question to have performed the hookup operation itself. Its Superintendent of Production was experienced in well hookups. When Graves hooks up new wells the owners are charged for the payroll labor.

Under the circumstances herein was Graves the statutory employer of plaintiff? We believe that it was.

In *Fugit, Administratrix v. United Beechcraft, Inc.,* 222 Kan. 312, 564 P.2d 521 (1977), we held:

"K.S.A. 44-503(*a*) does not require the work undertaken to be the primary work of the principal contractor. It is sufficient if such work is a part of the overall operations of the principal contractor. A principal contractor may engage in several types of business activity, any one of which may constitute an integral part of its trade or business." 222 Kan. at 315.

In *Woods v. Cessna Aircraft Co.,* 220 Kan. 479, 553 P.2d 900 (1976), the appropriate test was enunciated as follows:

" '(1) [I]s the work being performed by the independent contractor and the injured employee necessarily inherent in and an integral part of the principal's

trade or business? (2) is the work being performed by the independent contractor and the injured employee such as would ordinarily have been done by the employees of the principal?

" 'If either of the foregoing questions is answered in the affirmative the work being done is part of the principal's "trade or business," and the injured employee's sole remedy against the principal is under the Workmen's Compensation Act.' " 220 Kan. at 483-84.

See also *Zehring v. Wickman*, 232 Kan. 704, 658 P.2d 1004 (1983), and *Hanna v. CRA, Inc.*, 196 Kan. 156, 409 P.2d 786 (1966).

The provisions of the Workmen's Compensation Act are to be liberally construed to bring workers under the act whether or not it is desirable for the specific individual's circumstances. *Orr v. Holiday Inns, Inc.*, 230 Kan. 271, 634 P.2d 1067, *adopting* 6 Kan. App. 2d 335, 627 P.2d 1193 (1981).

The business of Graves is leasing, developing, operating and producing oil and gas properties. The undisputed facts show the drilling of wells, their completion, and their hookup to tank batteries were integral parts of such business. Further, Graves, as producer/operator of the lease, had the responsibility of bringing the new well into production—either by performing the necessary work itself or hiring it done by outsiders.

We conclude the trial court did not err in entering summary judgment in favor of defendant Graves Drilling Company, Inc., on the basis that said company was the statutory employer of plaintiff and hence plaintiff's sole remedy was under the Workmen's Compensation Act.

## CONCLUSION

The entry of summary judgment in favor of each of the defendants is affirmed.