Dawood K. SAMARAH, Plaintiff,

v.

DANEK MEDICAL, INC., a wholly owned subsidiary of Sofamor Danek Group, Inc., Defendants.

No. 95–2560–JWL.

United States District Court,
D. Kansas.

Aug. 26, 1999.

William P. Ronan, Cloon, Bennett & Ronan, Overland Park, KS, for Dawood K. Samarah, plaintiff.

Stephen S. Phillips, Philip H. Lebowitz, Pepper, Hamilton & Scheetz, Philadelphia, PA, W. Russell Welsh, Jessica A. Shulman, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for Danek Medical, Inc., defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this products liability action, plaintiff Dawood Samarah claims damages for injuries he allegedly sustained after defendants' bone screw fixation construct was surgically inserted into plaintiff's spinal pedicles in an effort to effect vertebral fusion. Plaintiff's claims are substantially identical to those asserted in numerous other actions filed by plaintiffs across the country claiming damages allegedly resulting from the manufacture and sale of orthopedic bone screw constructs. On August 4, 1994, the cases were consolidated by the Multidistrict Litigation Panel and transferred to the Honorable Louis C. Bechtle of the Eastern District of Pennsylvania for the resolution of several pretrial matters common to all such "bone screw" actions. On October 1, 1998, the case was remanded to this court, and the matter was reopened for further proceedings. Presently before the Court is defendants Danek Medical, Inc. and Sofamor Danek Group, Inc.'s (collectively "Danek's")[1] motion for summary judgment (doc. 30). For the reasons set forth below, defendants' motion for summary judgment is granted, and plaintiff's complaint is dismissed in its entirety.

## I. Background

The following facts are undisputed. Plaintiff is a 35 year-old male, who has experienced pain in his left leg since the early 1980's. At some point in 1982, plaintiff underwent lumbar surgery while in Damascus, Syria. After relocating to Wichita, Kansas in 1984, plaintiff began to experience lower back pain, and the pain in his left leg returned. As a result, plaintiff visited Dr. Bernard Poole, an orthopedic surgeon. Dr. Poole recommended that plaintiff undergo spinal disc surgery, and the surgery was performed shortly thereafter. No bone screw device was utilized during that surgery.

Plaintiff's 1984 back surgery was apparently successful in alleviating plaintiff's back pain for almost ten years. Indeed, between 1985–1992, plaintiff's medical records are largely devoid of any subjective complaints of back pain or discomfort. In late 1992, however, plaintiff began to experience a dull pain in his lower back and leg. Plaintiff's condition progressively worsened. Plaintiff sought medical assistance in an effort to alleviate his steadily increasing back pain, and was admitted to St. Joseph Medical Center by B.A. Sayeed, M.D. A battery of medical tests performed in March 1993 indicated that plaintiff suffered from arachnoiditis, possible lower lumbar spinal stenosis, and chronic left L5 radiculopathy.

Defendants' TSRH device consists of screws, hooks, rods, transverse traction devices, connectors and other components which may be customized, for spinal fusion surgery purposes, on a patient-by-patient basis. The TSRH construct, once surgically inserted, is intended to immobilize the diseased portion of the patient's spine by connecting adjacent spinal vertebrae with steel rods or plates. The rods or plates are anchored to the patient's spine by metal screws which are themselves in-

---

1. According to defendants, defendant Sofamor Danek Group, Inc. is a holding company that conducts no operations. Neither plaintiff nor defendants make any distinction between Danek Medical, Inc. and Sofamor Danek Group, Inc. in their papers. Thus, in accordance with the parties' practice during the course of this litigation, the court will refer to defendants collectively herein as "Danek."

serted into the spinal pedicles.[2] Bone graft material, often in the form of small chips taken from the patient's hip bone, is then packed between and alongside the TSRH device. If spinal fusion surgery is successful, the grafted bone material eventually fuses together to form a solid bony mass that stabilizes the diseased portion of the spine.

On March 5, 1993,[3] plaintiff elected to undergo spinal fusion surgery. Defendants' TSRH bone screw construct was surgically implanted at that time. Because plaintiff's operative report indicated that the left side pedicles were too small to be instrumented, Dr. Poole inserted a pedicle screw device unilaterally, on the right side pedicles only, at the L5–S1 level.

According to plaintiff's medical records, a follow-up visit on March 14, 1994 revealed "excellent sound fusion," and plaintiff was enjoying marked, asymptomatic improvement. On June 29, 1994, however,

plaintiff began to experience lower back pain and tingling in his legs. The pain and tingling were so severe that plaintiff was unable to sleep through the night. In July 1994, after a garage door opener[4] fell on him, plaintiff visited Michael P. Estivo, D.O., complaining of constant lower back pain and pain in both legs. According to Dr. Estivo, X-rays of plaintiff's spine revealed that the TSRH construct remained in good position. Given plaintiff's previous history of back operations, and due to the presence of scar tissue formation from plaintiff's previous surgeries, Dr. Estivo did not recommend any further surgery at that time.

In September 1994, plaintiff visited William Shapiro, M.D., a neurosurgeon. On September 28, 1994, Dr. Shapiro implanted a temporary epidural neurostimulator ("TENS") unit in an effort to relieve plaintiff's lower back and leg pain. Shortly thereafter, Dr. Shapiro referred plaintiff to Jacob Armani, M.D., a spine surgeon. Dr.

---

**2.** According to the report of plaintiff's expert Harold Alexander, Ph.D., "[t]he pedicles are the narrow bony archways which connect the anterior vertebral body to the posterial spinal elements."

**3.** The court notes that there appears to be some confusion regarding the actual date of plaintiff's surgery. According to the operative report submitted by defendants, the surgery took place on March 12, 1993. Although plaintiff admits defendants' statement of fact that the surgery occurred on March 12, 1993 in his response to defendants' motion for summary judgment, plaintiff's own statement of facts and his original complaint state that surgery occurred on March 5, 1993. Adding to the confusion is heading III.C. of plaintiff's response to defendants' motion for summary judgment which states: "Plaintiff Was Injured by the TSRH System Which Was Implanted into His Spine on March 3, 1993." Because the precise date of plaintiff's surgery has no bearing upon the resolution of the motion presently before the court, the court deems plaintiff's failure to controvert defendants' fact statement regarding the date of surgery as decisive on the issue, and will address the matter no further.

**4.** Plaintiff controverts defendants' factual assertion that his July 1994 visit to Dr. Estivo

was prompted by the fact that a garage door fell on him. Instead, plaintiff maintains that the garage door component that fell on him was the "garage door opener," and one notation in his medical records suggests that this was, in fact, what he explained to his treating physician. The court notes, however, that elsewhere in plaintiff's medical records, notations regarding the object that fell on plaintiff describe it as "a garage door" and "a garage door unit." Thus, it is somewhat unclear precisely what portion of the garage door fell on plaintiff. Furthermore, the court is unable to discern from the record to what specific part of the garage door plaintiff refers by his use of the term "garage door opener." If, by the use of that term, plaintiff means the small device normally attached to a car's sun visor which, when depressed, triggers a garage door to open, the court can hardly imagine what damage to plaintiff's back could possibly occur after such an opener fell on him, or, for that matter, from where an opener would so fall. If, on the other hand, plaintiff is referring to the mechanism that actually pulls an automatic garage door open, it is at least more clear why plaintiff would mention the incident to his treating physician. Because an identification of the particular garage door component that fell on plaintiff is unnecessary to the resolution of defendants' motion for summary judgment, however, the court will accept plaintiff's version as true.

Armani's examination revealed no evidence of fusion at the L5–S1 level. After discussing the matter at length with plaintiff, plaintiff elected to have the TSRH construct removed, and on December 15, 1994, the TSRH device was explanted from plaintiff's spinal column. According to Dr. Armani's operation report, plaintiff was found to have gross motion between L5 and S1, and there was no evidence of bony fusion. Dr. Armani testified later that, during the surgery, he observed no sign of breakage, bending, or stripping of the TSRH hardware.

Plaintiff's medical records indicate that he experienced significant relief from his back pain following the removal of the pedicle bone screws, although some of the leg numbness plaintiff had experienced prior to the operation continued to affect plaintiff's right leg after surgery. In July 1995, however, plaintiff's back pain recurred, and on September 14, 1995, a left lumbar discectomy at L4–5 was performed.

Plaintiff originally filed his complaint with this court on December 19, 1995. As set forth above, the case was consolidated with many other similar cases by the Multidistrict Litigation Panel and transferred to the Eastern District of Pennsylvania for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Danek moves for summary judgment on each of plaintiff's claims, arguing that no material issues of fact exist for trial.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every ac-

tion." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548(quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. Kansas Product Liability Act

Under Kansas law, product liability claims are governed by the Kansas Products Liability Act ("KPLA"), codified at K.S.A. § 60–3301 *et seq. See* K.S.A. § 60–3301 *et seq.* The underlying purpose of the KPLA is "to consolidate all product liability actions, regardless of theory, into one theory of legal liability." *Patton v. Hutchinson Wil–Rich Mfg. Co.,* 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993). Thus, under K.S.A. § 60–3302(c), "all legal theories of recovery, e.g., negligence, strict liability, and failure to warn, are to be merged into one legal theory called a 'product liability claim.' " *Id.* (citing *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 126, 795 P.2d 915, 931 (1990)) (KPLA's provisions "apply to actions based on strict liability in tort as well as negligence, breach of express or implied warranty, and breach of or failure to discharge a duty to warn or instruct.")

To succeed on his defective product claim, plaintiff "must produce proof of three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control." *Jenkins v. Amchem Products, Inc.,* 256 Kan. 602, 630, 886 P.2d 869, 886 (1994) (quoting *Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 54, 661 P.2d 348, 360 (1983)).

With respect to the second element of proof, Kansas courts require "that a product be *both* defective and unreasonably dangerous." *Id.* (emphasis added). In Kansas, a "defective condition" is defined as "a condition which is unreasonably dangerous to the ordinary user." *Id.* at

635, 886 P.2d at 889. The term "unreasonably dangerous" is defined under Kansas law as

> dangerous when used in the way it is ordinarily used considering the product's characteristics and common usage, and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it, with the ordinary knowledge common to the community as to its characteristics.

*Id.* Generalized assertions regarding a product's alleged defective nature are insufficient; instead, Kansas law requires plaintiff to establish the existence of a *specific* defect to prevail on a defective product claim. *Id.* at 635, 886 P.2d at 889 (emphasis added).

The court notes that the elements of a product liability claim "may be proven inferentially, by either direct or circumstantial evidence." *Mays,* 233 Kan. at 54, 661 P.2d at 360. If plaintiff seeks to prove his claim via circumstantial evidence, that evidence "must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." *Id.* Indeed, "[b]ecause liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility."[5] *Id.*

Defendants move for summary judgment with respect to plaintiff's product liability claim on the ground that plaintiff has failed to come forward with any evidence tending to show that the TSRH spinal fixation system is defective either in manufacture or design. In response, plaintiff offers the expert testimony of Drs. Alexander, Kimmel, Strom, and Welford to support his theory that the TSRH construct designed, manufactured, and sold by defendants was defective.

---

**5.** The court notes that, although the *Mays* court was faced with a manufacturing defect claim, as opposed to a design defect claim as is the case here, the Kansas Supreme Court has stated that "[i]t would appear that either a design defect or a manufacturing defect can be proven by circumstantial evidence." *Jenkins,* 256 Kan. at 634–35, 886 P.2d at 889.

Despite the large amount of expert witness opinion testimony and documentation attached to plaintiff's papers, the court concludes that plaintiff has provided inadequate evidence to support his defective product claim under Kansas law. A careful review of the opinions expressed by plaintiff's experts reveals nothing more than conclusory statements regarding the potential risks associated with the use of pedicle screw spinal fixation devices.

With respect to the evidence offered by Dr. Alexander, it appears to the court that Dr. Alexander's primary concern is that pedicle screw instrumentation systems have not been subjected to what he considers to be adequate, widespread scientific testing. Far from setting forth specific facts to satisfy how or why defendants' pedicle screw system is "unreasonably dangerous," Dr. Alexander's report merely states "[u]ntil these devises are adequately tested for pedicular fixation, it *must be assumed they are unreasonably dangerous.*" Without a specific factual basis to support this statement, plaintiff's burden on summary judgment is not satisfied by Dr. Alexander's opinion that the device must be *presumed* to be unreasonably dangerous.

Similarly unhelpful in this regard are the affidavit of Stephen E. Kimmel, M.D. and the accompanying article authored by Drs. Kimmel and Strom. The article discloses the results of a comprehensive review of medical literature relating to the use of pedicle fixation devices. Nowhere in their article, however, is a specific defect inherent to defendants' product identified. Furthermore, Dr. Kimmel states in his affidavit that, based on his review of the relevant medical studies, he is unable to "determine with any degree of certainty how safe or efficacious pedicle screws are in comparison to other available, approved procedures." Thus, not only is this evidence insufficient to establish the existence of a defect in defendants' product, it is entirely inconclusive as to the extent to which pedicle screw systems pose health risks to patients. The affidavit of Norman Welford, M.D. likewise fails to support plaintiff's products liability claim. Instead, Dr. Welford's letter merely details the underlying purpose and importance of FDA regulation, but does not offer any evidence with respect to the alleged defective nature of the TSRH system.

Furthermore, plaintiff has failed to identify the existence of, much less produce any evidence regarding, a specific defect in the TSRH instrumentation system at issue in this case. Indeed, it is uncontroverted that no breakage, bending, or other similar failure of the hardware occurred while implanted in plaintiff's spine. Thus, to the extent that plaintiff has failed to offer specific facts to indicate exactly how or why defendants' product is allegedly defective, plaintiff essentially requests the court to infer the existence of a defect in defendants' product solely from the fact that plaintiff sustained an injury allegedly attributable to the TSRH device. Under Kansas law, however, such proof is inadequate to establish a viable products liability claim. *See Jenkins,* 256 Kan. at 635, 886 P.2d at 889 ("Inferring a defect from the fact of the injury ... is unsuitable"). Because plaintiff is required to establish that a defect existed in the specific product *from which his products liability claim arises,* plaintiff's evidence fails in this respect as well.

Thus, as was the case in *Jenkins,* "[p]laintiff has failed to identify which specific aspect of defendants' product[ ] was defectively designed." *Id.* at 637, 886 P.2d at 890. Summary judgment in favor of defendants with respect to plaintiff's defective product claim is, therefore, appropriate.[6]

---

**6.** The court notes that, despite defendants' assertions to the contrary, it is unclear whether plaintiff is required to offer proof of a safer alternative design in order to prevail on a defective product claim. Indeed, the Kansas Supreme Court has stated that while "evidence of a feasible alternative design is admissible in design defect cases, ... *it probably*

## B. Defective Warning

Under Kansas law, "[a] product may be perfectly manufactured and meet every requirement for its designed utility and still be rendered unreasonably dangerous through failure to warn of its dangerous characteristics." *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 57, 661 P.2d 348, 363 (1983) (quoting *Jackson v. Coast Paint & Lacquer Company*, 499 F.2d 809, 811 (9th Cir.1974)). Defendants maintain that summary judgment is also appropriate with respect to plaintiff's failure to warn claim. Specifically, defendants contend that they are absolved from liability for the alleged breach of a duty to warn plaintiff of the potential risks associated with the use of the TSRH construct to effect spinal fusion under the learned intermediary doctrine.

Under the learned intermediary doctrine, a prescription drug manufacturer's duty to warn "is satisfied when the prescribing doctor is informed of a drug's inherent risks." *Nichols v. Central Merchandise, Inc.*, 16 Kan.App.2d 65, 67, 817 P.2d 1131, 1133 (1991). According to the Kansas Supreme Court, the "rule is based upon the theory that the physician acts as a learned intermediary between the drug manufacturer and the patient." *Humes v. Clinton*, 246 Kan. 590, 600, 792 P.2d 1032, 1039 (1990). Because "prescription drugs are available only to a physician, it is the physician's duty to inform himself or herself of the characteristics of the drugs prescribed and to exercise his or her judgment of which drug to administer in light of the drug's propensities and the patient's susceptibilities." *Id.* The learned intermediary doctrine allows the manufacturer to "assume a patient places reliance on the physician's judgment and relieves the manufacturer of a duty to assist the physician in communicating with patients." *Id.* at 601, 792 P.2d at 1039. In analyzing whether a warning is sufficiently adequate to inform the treating physician, a court must determine "whether the warning is 'reasonable under the circumstances.' " *Id.* at 606, 792 P.2d at 1043.

The court notes that, although Kansas courts have not specifically determined whether the learned intermediary doctrine applies in the context of spinal fusion instrumentation devices, Kansas courts have interpreted the exception to protect manufacturers of medical devices as well as prescription drugs. *Id* at 602, 792 P.2d at 1040 (because intrauterine devices (IUD's) are available only through licensed medical care providers, the doctrine applies to IUD manufacturers). The court therefore concludes that, if presented with the issue, Kansas courts would interpret the learned intermediary doctrine as assertable by the manufacturers of the medical device at issue in this case.

It is undisputed that defendants' TSRH system was accompanied by a package insert. That insert identified several possible adverse effects associated with use of the TSRH device, including:

> early or late loosening of the components; rod migration; disassembly, bending, loosening and/or breakage of any or all of the components or instruments; foreign body reaction to the implants including possible tumor formation; pressure on the skin from component parts where there is inadequate tissue coverage over the implant . . .; bone graft, intervertebral body and/or sacral fracture at, above, and/or below the level of surgery; non-union (or pseudoarthrosis); loss of neurological function, appearance of radiculopathy, and/or development of pain . . . cessation of growth of the fused portion of the spine; death.

The insert notes that "additional surgery may be necessary to correct some of these anticipated adverse reactions," and further provides:

> A successful result is not always achieved in every surgical case. This fact is especially true in spinal surgery

*is not required." Jenkins,* 256 Kan. at 636,

886 P.2d at 890 (emphasis added).

where many extenuating circumstances may compromise the results. The TSRH Spinal System is only a temporary implant and should only be used to augment spinal fusion. This device system is not intended to be the sole means of spinal support. Use of this product without a bone graft or in cases that develop into a non union will not be successful. No spinal implant can withstand body loads without the support of bone. In this event, bending, loosening, disassembly and/or breakage of the device(s) will eventually occur.

With regard to the duty to warn issue, plaintiff contends that a material fact issue exists. Specifically, plaintiff controverts defendants' assertion that "plaintiff's implanting physician ever saw the package insert," and thus contends that Dr. Poole was not aware of all of the possible risks associated with the TSRH instrumentation system. To support his assertion, plaintiff refers the court to his own deposition in which plaintiff testified that neither he nor Dr. Poole "saw" the warnings set forth in defendants' package insert. With regard to whether plaintiff himself reviewed the package insert, no fact issue exists because, under the learned intermediary doctrine, a medical device manufacturer may satisfy the duty to warn by presenting the warning to the treating physician. Thus, the relevant inquiry is not whether *plaintiff* read and understood the package insert, but instead whether plaintiff's *physician* was adequately warned of the dangers associated with the use of defendants' bone screw device.

The court concludes that plaintiff's failure to warn claim must fail because plaintiff has failed to come forward with specific facts tending to show that the package insert accompanying defendants' TSRH product was insufficient to warn Dr. Poole of the risks associated with use of the device as pedicle bone screws. Indeed, although plaintiff adamantly maintains that Dr. Poole did not receive the package insert and thus that he was not adequately

informed of the risks associated with the use of defendants' TSRH system, he cites to the "Deposition of Dr. Poole," identifying no specific page reference, to support this assertion. No such deposition is attached to plaintiff's papers, however, and the only deposition of Dr. Poole contained in the summary judgment record is a deposition that was apparently taken in the context of another bone screw case relating to the claims of Essie Lee Goldsmith, et al. It is unclear from plaintiff's papers whether it is this deposition of Dr. Poole to which he refers, and if so, what portion thereof supports his factual assertions. Indeed, the court has been unable to find anything in the deposition of Dr. Poole from the Goldsmith case that supports plaintiff's allegation that Dr. Poole was not aware of all of the risks associated with the TSRH mechanism. On the contrary, Dr. Poole testified in the Goldsmith deposition that "I have read all of the literature that I have seen reference all forms of internal fixation devices, and I have used that information together with my own judgment in order to make my best possible decision as to whether to use internal fixation in any given case and exactly what form to use." Thus, far from suggesting that Dr. Poole was unaware of the TSRH system's utility as a spinal fusion device and all of the risks associated therewith, it appears that, in the absence of any evidence to suggest that the facts were any different in Mr. Samarah's case than in Ms. Goldsmith's, Dr. Poole had studied the relevant literature and made an informed decision regarding his use of defendants' product prior to instrumenting his patients with the TSRH construct.

As noted above, it is the plaintiff's burden on summary judgment to come forward with specific facts tending to show the existence of a material fact issue with respect to his or her claim, and a vague reference to a piece of evidence which may or may not be currently before the court hardly satisfies that burden. The court cannot simply draw assumptions regarding

the adequacy of the warning accompanying defendants' product from plaintiff's unsupported assertion that Dr. Poole never received the package insert, and, in fact, Dr. Poole's deposition testimony tends to controvert any such assertion. Thus, the court concludes that plaintiff's failure to warn claim fails as a matter of law, and thus that defendants are entitled to summary judgment with respect to that claim.

### C. Causation

 Their other arguments notwithstanding, defendants further contend that summary judgment is appropriate on plaintiff's product liability claims because plaintiff has failed to demonstrate the existence of a material fact issue with respect to the issue of causation. Plaintiff, on the other hand, argues that causation is adequately established by the expert witness testimony and reports to which he refers the court. The court disagrees, and concludes that summary judgment on plaintiff's product liability claims is appropriate for the additional reason that plaintiff has offered insufficient evidence with respect to the issue of causation.

 As detailed above, a products liability plaintiff may not recover absent proof that the allegedly defective product caused the injuries asserted by plaintiff. *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994); *see also Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976) ("Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery.") Indeed, "[t]he mere fact that a person suffered injury while using a product is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury." *Id.* at 235–36, 552 P.2d at 943. In this case, then, plaintiff is required to come forward with sufficient evidence to establish that there exists

a causal nexus between the injury alleged and the defect charged.

To support his theory that the causation element has been satisfied in this case, plaintiff offers the opinions of Dr. Armani and Richard M. Dubinsky, M.D. In his brief, plaintiff claims that Dr. Armani "indicated his beliefs that 'some of the hardware is moving within the sacrum and L5 causing pain.'" Plaintiff does not, however, refer the court to source of that information. Nonetheless, the court was able to locate the statement to which plaintiff refers after much searching through the summary judgment record. Contrary to plaintiff's apparent characterization of that statement as Dr. Armani's own, however, the court notes that the particular language cited by plaintiff is found in a letter authored not by Dr. Armani, but instead by Dr. Shapiro, in which Dr. Shapiro relates what he believed Dr. Armani's opinion to be. Thus, not only is the offered statement unsupported by specific facts, it is hearsay, and cannot, therefore, be characterized as Dr. Armani's expert opinion regarding the cause of plaintiff's injuries. Even if this statement were Dr. Armani's own, however, the court finds it insufficient to prevent summary judgment because it is unsupported by specific facts to support the conclusion for which it stands. Indeed, there is nothing in Dr. Armani's notes to indicate, if the statement is, in fact, properly attributable to him, how he arrived at the conclusion that defendants' bone screws caused the injuries for which plaintiff presently seeks damages.

 As additional support for his causation argument, plaintiff offers a one and one-half page expert report from Dr. Dubinsky. In that report, Dr. Dubinsky outlines his understanding of plaintiff's history of back problems as gleaned from his review of plaintiff's medical records, and offers the following conclusion on the issue of causation:

> It is probable that the continuation of his right leg pain in 1994 was due to the pedicle screws and the psuedoarthosis

[sic] of L5 and S1. It is also probable that the arachnoiditis is the result of retained Pantopaque® from myelograms performed while the patient was living in Syria.

The court finds Dr. Dubinsky's report wholly inadequate to establish the element of causation. First, Dr. Dubinsky's conclusion is completely unsupported by any specific facts. Indeed, the majority of Dr. Dubinsky's report merely recounts the undisputed facts of plaintiff's medical history, and identifies no justification for his conclusion that plaintiff's injuries were caused by the TSRH device. Moreover, Dr. Dubinsky states that plaintiff's treatment while in Syria constitutes an additional probable cause of plaintiff's recurrent back pain. Dr. Dubinsky's report fails to differentiate or otherwise analyze which of the two possible causes stated therein is more likely to have caused plaintiff's pain. Instead, it appears that Dr. Dubinsky considers both the TSRH construct and plaintiff's previous spinal treatment equally likely causes of plaintiff's recurrent back problems. Thus, in addition to being conclusory and completely unsupported by specific facts, Dr. Dubinsky's report does nothing more than establish the mere possibility that plaintiff's injuries are causally related to defendants' product. Without a more detailed analysis, or at least some type of comparison between the two probable causes identified by Dr. Dubinsky, the court concludes that no reasonable fact finder could infer the existence of a causal connection between the TSRH construct and plaintiff's injuries from Dr. Dubinsky's report.

■ As a final attempt to avoid summary judgment on the issue of causation, plaintiff refers the court to Dr. Alexander's generic expert testimony report regarding the use of pedicle fixation devices. Dr. Alexander's report speaks in generalities, detailing the possible risks associated with the use of pedicle screw systems in spinal fusion surgery, but identifies no specific defects attributable to defendants' product.

As detailed above, the court finds Dr. Alexander's report insufficient to create a material fact issue with respect to whether defendants' product is defective. To establish causation, plaintiff must adduce evidence tending to show a causal connection between the allegedly defective product and plaintiff's specific injuries. Dr. Alexander's report is insufficient in this regard for two reasons: first, Dr. Alexander's testimony relates to pedicle screw systems as a whole, and not to the specific TSRH device at issue here. More importantly, however, because Dr. Alexander is a "generic" expert, his opinion is not case-specific, and fails, therefore, to establish a causal connection between defendants' product and Mr. Samarah's particular injuries. As such, the opinions set forth in Dr. Alexander's report are insufficient to establish causation in the case at bar.

The court therefore concludes that plaintiff's evidence is simply insufficient to create a material fact issue for trial with respect to the issue of causation. Accordingly, defendants are entitled to summary judgment on plaintiff's products liability claims for the additional reason that plaintiff is unable to establish a causal nexus between the injuries alleged and any defect in the TSRH construct.

### D. "Fraud on the FDA" and State Law Fraud Claims

■ In his papers, plaintiff asserts several fraud-based claims which, when distilled, are essentially premised on the theory that, although defendants' bone screws had not received FDA approval for use as spinal fixation devices, defendants illegally marketed them for such use nonetheless. Because the court concludes that plaintiff has offered insufficient evidence to establish an injury attributable to a defect in defendants' TSRH construct, or that any reliance upon defendants' alleged misrepresentations occurred in this case, plaintiff's fraud-based claims must fail.

In response to growing concerns regarding the safety and effectiveness of the wide

variety of medical devices introduced to a steadily-expanding market, Congress enacted the Medical Device Amendments of 1976 ("MDA"), §§ 21 U.S.C. §§ 360c–360k, to the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), § 21 U.S.C. § 301 *et seq. See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Under the MDA, medical devices are classified into three categories depending on the risk each device poses to the general public. *Id.* Class I devices are those which present no unreasonable risk of illness or injury and are subject only to minimal regulation under "general controls." § 21 U.S.C. § 360c(a)(1)(A). "Devices that are potentially more harmful are designated Class II; although they may be marketed without advance approval, manufacturers of such devices must comply with federal performance regulations known as 'special controls.'" *Lohr*, 518 U.S. at 477, 116 S.Ct. 2240 (citing § 21 U.S.C. § 360c(a)(1)(B)). The Class III category is reserved for medical devices which "present a potential unreasonable risk of illness or injury," or which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." § 21 U.S.C. § 360c(a)(1)(C).

It is clear from the summary judgment record that defendants received FDA approval to market their bone screws as sacral screws, and that at no time was such approval granted for marketing the screws for use in spinal pedicles. Plaintiff's contention that defendants were, in fact, aware of the dangers associated with the screws' attachment to pedicles, and were not permitted by the FDA to market them for such use, is amply supported by facts in the summary judgment record. Plaintiff maintains that, despite the fact that FDA clearance had not issued with respect to the use of defendants' product as pedicle screws, defendants nonetheless engaged in a highly-funded campaign to promote the use of their bone screws to effect spinal fusion. Plaintiff claims that doctors nationwide were effectively "brainwashed" by defendants' widespread touting of the screws' suitability as spinal fixation devices, and that he suffered damages as a result. Plaintiff claims that such marketing violated the provisions of the MDA, and that defendants should be liable for any injuries resulting therefrom on a negligence *per se* theory, or, in the alternative, under a common law theory of fraud or misrepresentation.

It is unclear whether, under Kansas law, a plaintiff may recover for defendants' alleged violations of the MDA on a negligence *per se* or other common law fraud theory. The Supreme Court has recently held that, although no express private right of action is provided under the FDCA, "[n]othing in § 360k denies [a state] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Lohr*, 518 U.S. at 495, 116 S.Ct. 2240. The Third Circuit has interpreted the *Lohr* holding in the context of the bone screw litigation to mean that a plaintiff's claim under state law for conduct in violation of the MDA, despite the fact that no private right of action is provided thereunder, is not preempted by federal law. *See In re Orthopedic Bone Screw Liability Litig.*, 159 F.3d 817, 824 (3d Cir.1998) ("Refusing to entertain [plaintiff's] fraudulent misrepresentation claim solely because the statutory scheme does not contain a private cause of action would be the equivalent of finding preemption of state law claims contrary to the clear holding of *Lohr*.") The court declines to opine as to whether a negligence *per se* action for defendants' alleged MDA violations arises under Kansas law, however, because even if it were the case that defendants' conduct constitutes a violation of the MDA, that fact, standing alone, would be insufficient to establish plaintiff's entitlement to recovery on his claims arising from defendants' alleged misrepresentations.

■ In Kansas, "[a]ctionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury." *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 603, 876 P.2d 609, 615 (1994). Thus, to recover under a theory based on defendants' alleged misrepresentations, plaintiff must adduce evidence tending to show that: a) reliance upon the illegal marketing practices in which defendants allegedly engaged occurred, which, in this case, requires evidence that Dr. Poole's decision to implant the TSRH construct during plaintiff's spinal fusion surgery was made in reliance upon defendants' allegedly untrue statements regarding the suitability of the screws for pedicle insertion, and b) that plaintiff was injured by Dr. Poole's implantation of the TSRH device. As set forth above, the court concludes that plaintiff has failed to meet his summary judgment burden with regard to the issue of injury causation. Summary judgment with respect to plaintiff's fraud-based claims is appropriate on this basis alone. Nonetheless, the court has reviewed the record in an effort to determine whether there exists any evidence of Dr. Poole's reliance on defendants' alleged illegal marketing scheme.[7]

Dr. Poole's professional credentials are undisputed. Dr. Poole received his medical degree from Ireland's Dublin University, after which he participated in a six-year residency program. Dr. Poole successfully completed specialty medical examinations at the Royal College of Surgeons of England and Royal Surgeons of Ireland in 1969. At the time of plaintiff's surgery, Dr. Poole had been practicing medicine for just over thirty years. According to his testimony, when a patient so requires, Dr. Poole has utilized pedicle screws as a spinal fusion technique since 1973.

The court concludes that plaintiff's fraud-based claims must fail for lack of evidence tending to establish that Dr. Poole in any way relied upon defendants' allegedly illegal marketing scheme when making his decision to use defendants' bone screws during plaintiff's spinal fusion surgery. Indeed, it is just as likely that, rather than being influenced by, or even exposed to, defendants' alleged promotional campaigning with respect to the use of their products as pedicle bone screws, the decision to utilize the TSRH device was merely a product of Dr. Poole's own professional medical judgment. As set forth above, Dr. Poole's deposition testimony indicates that, in each case, his decision to use pedicle screws was made after considering the information contained in the relevant medical literature, the factual circumstances underlying each particular patient's medical condition, and his own medical judgment. There is simply no evidence in the record to support the allegation that Dr. Poole relied on any representations, fraudulent or otherwise, regarding the TSRH device's suitability for use in spinal fusion surgery. Absent any such proof, plaintiff cannot establish the element of reliance necessary for recovery on his claim for fraud, and summary judgment in favor of defendants with respect to plaintiff's fraud-based claims is therefore appropriate.

Thus, the court concludes that plaintiff's evidence, at best, suggests that the TSRH devices were possibly less than ideal for

---

7. The court notes that Dr. Poole's use of the screws, despite the fact that they had not been cleared for use in spinal fixation surgery, in not illegal in and of itself. This is true because "the FDA permits doctors to prescribe drugs for 'off-label' use." *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir.1994). Specifically, § 21 U.S.C. 396 provides: "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." § 21 U.S.C. 396.

use as implanted by Dr. Poole, especially in light of their approval only for use as sacral screws. Given Dr. Poole's extensive qualifications, however, the court finds that insufficient evidence exists from which a reasonable fact finder could infer that Dr. Poole's choice to utilize the TSRH construct is attributable to defendants' alleged illegal marketing tactics, rather than to Dr. Poole's professional medical judgment.

In short, plaintiff has failed to offer sufficient evidence to establish that the alleged injuries were caused by the implantation of defendants' TSRH instrumentation system, much less which particular characteristic of the TSRH device caused plaintiff's injuries. Thus, whether plaintiff's claims are based on allegations of defendants' failure to seek FDA approval, defective design, defective manufacture or negligent failure to warn, plaintiff has failed to set forth specific facts to support his assertion that any act attributable to defendants or their product caused the injury complained of in this case.

### E. Remaining Claims

The court concludes that defendants are entitled to summary judgment with respect to plaintiff's remaining claims for civil conspiracy and intentional/negligent infliction of emotional distress. Specifically, plaintiff's claim for civil conspiracy necessarily fails in light of the court's conclusion that plaintiff has failed to establish any actionable conduct on the part of defendants. *See, e.g., State ex rel. Mays v. Ridenhour,* 248 Kan. 919, 927, 811 P.2d 1220, 1226 (1991) (no cause of action exists for civil conspiracy claim absent independent unlawful act under Kansas law). Similarly, plaintiff's claim for negligent infliction of emotional distress fails because plaintiff has failed to establish any negligence on the part of defendants. Plaintiff has not addressed his claim for intentional infliction of emotional distress in his response in opposition to defendants' motion for summary judgment, and, therefore, the court deems that claim abandoned. Summary judgment in favor of defendants with respect to plaintiff's remaining claims is, therefore, appropriate.

Thus, for all of the reasons set forth above, summary judgment in favor of defendants is granted, and plaintiff's complaint is dismissed in its entirety.[8]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 30) is granted. Plaintiff's complaint is dismissed in its entirety.

---

**8.** The court notes that, in their papers, defendants challenge the admissibility of plaintiff's expert testimony under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. In *Daubert,* the Supreme court held that district courts are to serve a "gatekeeping" function in the admission of expert testimony, "thereby ensuring that such evidence is both relevant and reliable." *Kinser v. Gehl Co.,* 184 F.3d 1259, 1270 (10th Cir.1999) (citing *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). Because the court concludes that defendants are entitled to summary judgment even when plaintiff's expert testimony is considered, the court declines to analyze the admissibility of plaintiff's experts under *Daubert.*